[Civ. No. 20557. First Dist., Div. One. Oct. 30, 1963.]

ROGER HOM, Plaintiff and Respondent, v. LEE N. CLARK, Defendant and Appellant.

[Civ. No. 20558. First Dist., Div. One. Oct. 30, 1963.]

PAUL H. ONG, Plaintiff and Respondent, v. LEE N. CLARK, Defendant and Appellant.

(Consolidated Cases.)

Dunne, Bledsoe, Smith, Phelps, Cathcart & Johnson and Robert A. Seligson for Defendant and Appellant.

Lewis & Fonnesbeck, Yale H. Smulyan, Leon Fonnesbeck and William B. Boone for Plaintiffs and Respondents.

MOLINARI, J.—This is an appeal by defendant from a judgment in favor of plaintiffs, Paul H. Ong and Roger Hom, after a jury verdict in consolidated personal injury actions arising out of an automobile-pedestrian accident.

### Facts

The facts connected with the happening of the accident are essentially as follows:[1] Plaintiffs were crossing Broadway at its intersection with Grant Avenue in San Francisco in the early morning of February 23, 1958, when they were struck by an automobile driven by defendant. Plaintiffs had spent the evening of the accident in Chinatown celebrating the Chinese New Year. Both plaintiffs admitted to having had several drinks over the course of the evening. After having something to eat in a restaurant plaintiffs proceeded along Grant Avenue, on the left-hand side of the street, to Broadway. Ong's last recollection of the events of the evening was crossing Pacific Avenue, one block away from Broadway where the accident occurred. Hom, on the other hand, testified that when he and Ong approached the corner of Broadway and Grant Avenue, he saw that the signal light at the intersection of Broadway and Columbus Avenue was "red" for Broadway traffic. (The intersection of Broadway and Columbus is east of the Broadway-Grant interesection.) Hom testified that at that time he said " 'Let's proceed and walk across....' " He also stated that he did not see any cars headed in a westerly direction on Broadway waiting for the signal to change. Hom further testified that he and Ong started to cross Broadway and that after he passed the center of Broadway, the next thing he knew he was hit.

Defendant testified that on the night of the accident he

---

[1]Such other facts as may be pertinent to the particular questions raised on appeal will be set out and discussed in connection with said questions.

and his wife had dinner at home and that they each had two cocktails between 8 p.m. and 8:30 p.m.; that they then went to a movie, after which they drove to Fisherman's Wharf and thence to Telegraph Hill, where they parked for a while; that then they went to a restaurant near the corner of Broadway and Columbus Avenue; that upon leaving the restaurant he started driving west on Broadway toward the Broadway and Columbus intersection; that he stopped at Columbus Avenue for a red light and that when it turned green he proceeded across the intersection at a speed of approximately 25 miles per hour; that he first saw plaintiffs when they were a car length in front of him; that, according to his estimate, they were walking about 4 to 6 feet west of the property line on the west side of Grant Avenue; that he swerved his car to the left and applied his brakes; that his car struck plaintiffs; and that his car travelled from 15 to 20 feet after the impact.

An investigating police officer testified that defendant's automobile travelled 39 feet 4 inches from the point of impact until it came to rest; and that the point of impact was within the prolongation of the westerly curb and property lines of Grant Avenue.

### Contentions

The basic contentions of the respective parties are as follows: Plaintiffs claim that they were crossing in an unmarked crosswalk and that therefore defendant was required to yield the right of way to them.[2] Defendant maintains that as a matter of law there was no crosswalk where plaintiffs were crossing and that they should have yielded the right of way to defendant's automobile.[3] Defendant also contends that plaintiffs were prohibited from crossing where they did by signs which plainly stated they should not cross there and by other action of the local authorities in designating the Grant Avenue, Broadway, and Columbus Avenue intersection as a " 'single intersection.' . . ." The specific questions raised by this appeal are hereinafter set out in the headings of this opinion. All references to the Vehicle Code, unless

[2]Veh. Code § 560, subd. (a), provided: "The driver of a vehicle shall yield the right of way to a pedestrian crossing the roadway within any marked crosswalk or within any unmarked crosswalk at an intersection, except as otherwise provided in this chapter."

[3]Veh. Code, § 562, provided in part: " (a) Every pedestrian crossing a roadway at any point other than within a marked crosswalk or within an unmarked crosswalk at an intersection shall yield the right of way to all vehicles upon the roadway."

otherwise indicated, are to the statute as it read as of February 23, 1958, the date of the accident.

### *Was it Error for the Trial Court to Refuse to Instruct on Section 3 of the San Francisco Traffic Code?*

 *No.* It is undisputed that there was no marked crosswalk where plaintiffs were crossing at the time of the accident. Plaintiffs contend that an unmarked crosswalk existed across Broadway within the prolongation of the boundary lines of the sidewalk on the west side of Grant Avenue pursuant to the provisions of Vehicle Code section 85[4] in effect at the time of the accident, providing as follows: " 'Crosswalk' is either: (a) That portion of a roadway ordinarily included within the prolongation or connection of the boundary lines of sidewalks at intersections where the intersecting roadways meet at approximately right angles, except the prolongation of any such lines from an alley across a street. (b) Any portion of a roadway distinctly indicated for pedestrian crossing by lines or other markings on the surface. (c) Notwithstanding the foregoing provisions of this section, there shall not be a crosswalk where local authorities have placed signs indicating no crossing.'' It is likewise undisputed that Broadway and Grant Avenue meet at approximately right angles. Defendant contends, however, that, as a matter of law, Grant Avenue is an alley, and that accordingly there can be no prolongation of such lines from Grant Avenue across Broadway so as to create a crosswalk pursuant to section 85. Defendant's contention is based upon the provisions of section 3, subdivision (a), of the Traffic Code of the San Francisco Municipal Code (pt. II, ch. XI)[5] which defines an alley as ''A street with a roadway of less than thirty (30) feet.'' It is undisputed that Grant Avenue has a roadway of 24 feet.

At the time of the accident in this case section 85 did not define ''alley,'' nor was the term anywhere defined in the Vehicle Code.[5a] It is defendant's assertion, therefore, that the definition of alley contained in the Traffic

---

[4]All statutory references hereinafter are to the Vehicle Code unless otherwise indicated.

[5]Hereinafter referred to as ''the Traffic Code.''

[5a]The Legislature has since defined ''alley'' by the enactment in 1963 of Veh. Code, § 110, which provides as follows: '' 'Alley' is any highway having a roadway not exceeding 25 feet in width which is primarily used for access to the rear or side entrances of abutting property.'' (Effective Sept. 20, 1963.)

Code is applicable to section 85. He argues that section 553 is indicative of a legislative intent to leave the definition of "alley" to local ordinance. Section 553, in force at the time of the accident in the present case, provided as follows: "The driver of a vehicle about to enter or cross a highway from any private road or driveway or from an alley not exceeding a width of twenty-two feet *or from any alley as may be defined by local ordinance* shall yield the right of way to all vehicles approaching on said highway." (Italics added.) In the application of this section an alley is a roadway not exceeding a width of 22 feet, or as defined by local ordinance. Three cases are cited by defendant in support of his position: *Hosi* v. *La Vey*, 102 Cal.App.2d 597 [228 P.2d 35]; *Hopkins* v. *Galland Mercantile Laundry Co.*, 218 Cal. 130 [21 P.2d 553]; and *Kowalski* v. *Shell Chemical Corp.*, 177 Cal.App.2d 528 [2 Cal.Rptr. 319].

*Hopkins* is not at all in point. The Supreme Court was there called upon to apply a local ordinance providing for crosswalks. The ordinance provided that a pedestrian should not cross a roadway other than by a crosswalk which was a portion of the roadway included within the prolongation of curb and property lines and *street* intersections. The ordinance in question specifically provided that an alley was a street with a roadway less than 20 feet, and that a street was the roadway set apart for public travel except alleyways.[6] There a pedestrian crossed a street in San Francisco at a point opposite an alley known as Campton Place, which was 19 feet 4 inches wide. The Supreme Court held that since Campton Place was an alley, there was no crosswalk where plaintiff was crossing and that therefore he was negligent as a matter of law. It should be noted, however, that the accident in question occurred in 1929 at a time when section 85 and its predecessor statutes had not been enacted.[7] *Hopkins* was, therefore, dealing strictly with a local ordinance which applied to a field in which the state had not yet legislated, and was construing a statute which was specific in its application to a local situation.[8]

[6]San Francisco Ordinance No. 7691.

[7]The Legislature first provided for a pedestrian's right of way at a crosswalk in 1931. (Stats. 1931, ch. 1026, § 47, p. 2127; and see present § 275 "Legislative History.")

[8]Said Ordinance 7691 was held invalid in 1942 because it was in conflict with the Vehicle Code provisions regulating the use of public roadways by pedestrians. (*Fuentes* v. *Ling*, 21 Cal.2d 59, 61 [130 P.2d 121].)

In *Hosi*, a pedestrian was injured while crossing Sixteenth Street in San Francisco at a point where it intersected with Rondel Place, between Mission and Valencia Streets. The reviewing court held that there was no crosswalk at the point of the crossing and accordingly determined that there was sufficient evidence to sustain a finding of contributory negligence on the basis that the pedestrian had crossed a street at a point outside a crosswalk. In that case, however, the parties had *stipulated* in the trial court that the Traffic Code of San Francisco provides that an alley is a street with a roadway of less than 30 feet. It does not appear in the opinion whether the appellate court had section 3, subdivision (a), of the Traffic Code before it, or whether said section was considered in relation to section 85. Moreover, the opinion does not discuss or mention the effect or applicability of any Vehicle Code sections at all. It is apparent from a reading of *Hosi* that the reviewing court was proceeding on the assumption that the parties had stipulated that Rondel Place was an alley.

*Kowalski* does not involve a pedestrian right of way situation but the question of a right of way as between two vehicles. The appellate court was there called upon to consider the very local code section before us, i.e., section 3, subdivision (a), of the Traffic Code. The holding of the court was to the effect that the trial court properly instructed that Commercial Street, which was 24 feet wide, was an alley in connection with section 553, which provides that the driver of a vehicle entering a highway from an alley shall yield the right of way to all vehicles approaching on the highway. It should be particularly noted, as we have pointed out above, that in section 553 the Legislature has specifically provided that the "alley" therein referred to may be defined by local ordinance. The essence of the holding in *Kowalski* is that the local ordinance having undertaken to define an alley as a street with a roadway of less than 30 feet, a street 24 feet in width in San Francisco was an alley in the contemplation of section 553, although in the absence of such a local ordinance an alley under section 553 would be one which did not exceed 22 feet in width.

The important question before us is whether the definition of "alley" in section 3, subdivision (a), of the Traffic Code may be read into the meaning of the word "alley" as contained in section 85, and which the Legislature has left undefined. In *Pipoly* v. *Benson*, 20 Cal.2d 366 [125 P.2d 482, 147

A.L.R. 515], a leading case in the field of preemption of a local ordinance by general law, an ordinance prohibiting pedestrians to cross public roadways " 'other than by a crosswalk in a central traffic district or in any business district' " was held invalid because it attempted to impose additional requirements in a field which was fully occupied by statute. (P. 368.) It was there held that section 458[9] and sections 560-564[10] "cover" the use of public roadways by pedestrians. The principle announced in *Pipoly* is that where the Legislature has assumed to regulate a given course of conduct by prohibitory enactments, a municipality with subordinate power to act in the matter may make such new and additional regulations, in aid and furtherance of the general law as may seem fit and appropriate to the necessities of the particular locality and as are not in themselves unreasonable, excepting, however, where such additional requirements are in a field which is fully occupied by state statute. *Pipoly* was followed and invoked in *Fuentes* v. *Ling,* 21 Cal.2d 59 [130 P.2d 121], which declared invalid the very San Francisco ordinance considered in *Hopkins,* on the ground that the Vehicle Code regulates the use of public highways by pedestrians to the exclusion of local ordinances. ▮ The principle announced in *Pipoly* has jelled into a rule of law, which has been consistently followed by our Supreme Court, and is stated as follows: "Whenever the Legislature has seen fit to adopt a general scheme for the regulation of a particular subject, the entire control over whatever phases of the subject are covered by state legislation ceases as far as local legislation is concerned. [Citation.] ▮ In determining whether the Legislature intended to occupy a particular field to the exclusion of all local regulation, we may look to the 'whole purpose and scope of the legislative scheme' and are not required to find such an intent solely in the language used in the statute." (*In re Lane,* 58 Cal.2d 99, 102-103 [22 Cal.Rptr. 857, 372 P.2d 897]; *In re Moss,* 58 Cal.2d 117, 118 [23 Cal.Rptr. 361, 373 P.2d 425]; *In re Loretizo,* 59 Cal.2d 445, 446 [30 Cal.Rptr. 16, 380 P.2d 656]; *In re Koehne,* 59 Cal.2d 646, 648 [30 Cal.Rptr. 809, 381 P.2d 633]; *In re Zorn,* 59 Cal.2d 650, 651 [30 Cal.Rptr. 811, 381 P.2d 635].)

[9]§ 458: "The provisions of this division are applicable and uniform throughout the State and in all counties and municipalities therein and no local authority shall enact or enforce any ordinance on the matters covered by this division unless expressly authorized herein."

[10]Providing for "Pedestrians' Rights and Duties."

█ In the light of the authorities cited it is clear that the general law has preempted local law with respect to the rights and duties of pedestrians crossing roadways. In enacting sections 560-564 the Legislature has adopted a general scheme for the regulation of this particular subject. This scheme, including the rights and duties of pedestrians in and outside crosswalks, of necessity includes the definition of crosswalk contained in section 85. Accordingly, it is not within the province of local law to define a crosswalk. Section 85 does not provide that local ordinance may define a crosswalk, nor does it leave the definition of alley to local ordinance, as does section 553, which specifically grants to local authorities the right to define an alley. █ Defendant argues that the Legislature, by enacting section 553, has left the definition of "alley" in all instances to local ordinance. This argument is without merit because section 553 is applicable to the restricted situation therein provided only. Had the Legislature intended to permit local authorities to define "alley" in connection with the meaning of crosswalk it would have said so. This conclusion coincides with the decision in *Pipoly* and is consistent with section 458 providing that "no local authority shall enact or enforce any ordinance on the matters covered by this division *unless expressly authorized herein.*" (Italics added.) We hold, therefore, that the definition of "alley" contained in section 3, subdivision (a), of the Traffic Code is not applicable to section 85. It should be noted, moreover, that the Traffic Code does not presume to define the meaning of words and phrases in the Vehicle Code, but restricts the definition of "alley" to the Traffic Code itself.[11] █ The court below was not required, therefore, to instruct the jury that the definition of an "alley" was as defined in the ordinance.

█ Our inquiry is directed, then, as to whether it was incumbent upon the trial court to have instructed the jury on the meaning of the word "alley" in section 85. The court did not so instruct. In our opinion such an instruction was not necessary because the meaning of "alley" in section 85 is a question of law for the trial court; not a question of fact for determination by the jury. █ The construction of a statute and its applicability to a given situation are matters

---

[11]§ 3 of the Traffic Code provides: "Whenever *in this Code* the following terms are used, they shall have the meaning respectively ascribed to them in this section, unless otherwise apparent from the context: ..." (Italics added.)

of law to be determined by the court. (*Estate of Madison,* 26 Cal.2d 453, 456 [159 P.2d 630]; *Neal* v. *State of California,* 55 Cal.2d 11, 17 [9 Cal.Rptr. 607, 357 P.2d 839]; *County of Monterey* v. *Madolora,* 171 Cal.App.2d 840, 841 [341 P.2d 333]; *Chiappe* v. *Eichenbaum,* 169 Cal.App.2d 46, 53 [336 P.2d 1045]; Code Civ. Proc., § 2102.)

Webster defines an "alley" as "a passageway between buildings; a lane wide enough only for persons on foot; a narrow street wide enough for only one vehicle; a thoroughfare through the middle of a square or block giving access to the rear of lots or buildings. . . ." (Webster's Third New Internat. Dict.) An "alley" is conventionally understood, in its relation to towns and cities, to mean a narrow street in common use. It is a narrow public passageway in a city or town as distinguished from a public street. (See *Bailey* v. *Culver,* 12 Mo. App. 175, 183; *Praigg* v. *Western Paving & Supply Co.,* 143 Ind. 358 [42 N.E. 750, 751].) "Alley," when used without qualification, ordinarily means a public alley. (*Schultz* v. *Redondo Improvement Co.,* 156 Cal. 439, 442 [105 P. 118].)

Courts take judicial notice of "[t]he true signification of all English words and phrases, and of all legal expressions" (Code Civ. Proc., § 1875, subd. 1); and this includes all the terms used in the Constitution or in the acts of the Legislature. (*Sheehy* v. *Shinn,* 103 Cal. 325, 329 [37 P. 393].) They also take judicial notice of matters of common knowledge within the jurisdiction which are certain and indisputable. (*People* v. *Tossetti,* 107 Cal.App. 7, 10 [289 P. 881]; *Galloway* v. *Moreno,* 183 Cal.App.2d 803, 809 [7 Cal. Rptr. 349]; *People* v. *Torres,* 56 Cal.2d 864, 866 [17 Cal. Rptr. 495, 366 P.2d 823]; *Varcoe* v. *Lee,* 180 Cal. 338, 344-345 [181 P. 223].) Among the matters of common knowledge of which judicial notice may be taken is the existence and location of streets and thoroughfares. (*People* v. *Kutz,* 187 Cal.App.2d 431, 434 [9 Cal.Rptr. 626]; *Varcoe* v. *Lee, supra,* pp. 342-345; *McKinley* v. *Dalton,* 128 Cal.App. 298, 303 [17 P.2d 160]; *Kingston* v. *Hardt,* 18 Cal.App.2d 61, 63 [62 P.2d 1376].) Judicial notice may also be taken of the character of streets (*Sinclair* v. *Pioneer Truck Co.,* 51 Cal.App. 174, 178 [196 P. 281]; *Varcoe* v. *Lee, supra,* p. 344); of their relation to each other (*Pacific Paving Co.* v. *Verso,* 12 Cal.App. 362, 365 [107 P. 590]; *Diggins* v. *Hart-shorne,* 108 Cal. 154, 157-158 [41 P. 283]); and of their congestion with pedestrians and vehicular travel (*Reaugh* v.

*Cudahy Packing Co.,* 189 Cal. 335, 340-341 [208 P. 125]; *Katz* v. *Helbing,* 205 Cal. 629, 635 [271 P. 1062, 62 A.L.R. 825]; *Wahrenbrock* v. *Los Angeles Transit Lines,* 84 Cal. App.2d 236, 239 [190 P.2d 272]; *Larsen* v. *City & County of San Francisco,* 152 Cal.App.2d 355, 369 [313 P.2d 959]).

In the case at bench the trial court was entitled to take judicial notice of the ordinary and dictionary meaning of the word ''alley.'' As a court sitting in San Francisco, the trial judge was also entitled to take judicial notice of Grant Avenue in San Francisco, and such matters of common knowledge in the community as Grant Avenue's importance as the main artery in San Francisco's Chinatown and its characteristics as a busy and well-travelled roadway for pedestrians and vehicles. The trial court could also take judicial notice that Grant Avenue at its intersection with Broadway is 24[12] feet wide and wide enough to permit three passenger automobiles to travel abreast.[13]

It was the trial court's function and duty, accordingly, to interpret the meaning of the word ''alley'' in the light of the facts which it judicially noticed. The Legislature not having prescribed a meaning to the word ''alley'' in section 85, the meaning of the term was left to the trial court's interpretation, subject to the rule that words in a statute should be given their ordinary meaning and receive sensible construction in accord with the commonly understood meaning thereof. (*County of Los Angeles* v. *Frisbie,* 19 Cal.2d 634, 642 [122 P.2d 526]; *People* v. *Kimbley,* 189 Cal. App.2d 300, 306 [11 Cal.Rptr. 519]; Civ. Code § 13; and see *County of Monterey* v. *Madolora, supra,* 171 Cal.App.2d 840, 841.) The word ''alley'' would ordinarily be understood by persons to whom it is addressed as a narrow street, in the sense of a passageway between buildings, not used as a heavily travelled thoroughfare. In its common acceptation, a thoroughfare 24 feet wide, capable of accommodating three vehicles abreast, having a heavy volume of pedestrian and vehicular traffic, and constituting the main public artery in a city for a considerable distance, such as Grant Avenue in the

---

[12]The said width of Grant Avenue was also an evidentiary fact before the court and jury.

[13]An appellate court has the same power to take judicial notice as a trial court. (*Ahlgren* v. *Carr,* 209 Cal.App.2d 248, 257 [25 Cal.Rptr. 887]; *Alisal Sanitary Dist.* v. *Kennedy,* 180 Cal.App.2d 69, 81 [4 Cal. Rptr. 379].)

instant case, would not be termed or understood to be an alley by the ordinary person. We hold, therefore, that the trial court was justified in concluding as a matter of law under the circumstances that Grant Avenue, at its intersection with Broadway, is not an alley in its general and ordinary understanding, and within the meaning of section 85. Accordingly, the trial court would have been justified in the present case in omitting in its instructions any reference to "alley" insofar as the definition of "crosswalk" was concerned.

The trial court did, however, instruct the jury in the language of section 85 in its entirety, and thus told the jury that the prolongation of the boundary lines of a sidewalk across a street, at the intersection of an alley and such street, is not a crosswalk. This instruction, however, prejudiced plaintiffs rather than defendant, because if the jury determined that Grant Avenue was an alley, then plaintiffs could not be in a crosswalk as they crossed Broadway. Accordingly, if the jury reached this conclusion, plaintiffs were under a duty to yield the right of way to defendant under the trial court's instructions. The jury was properly instructed that "every pedestrian crossing a roadway at any point other than within a marked cross-walk or within an unmarked cross-walk at an intersection shall yield the right of way to all vehicles upon the roadway." Under the circumstances, this instruction, when read in conjunction with an instruction embracing the language of section 85, redounded to defendant's benefit rather than to his detriment. A party cannot complain of an instruction more favorable to him than that to which he is entitled. (*Smith* v. *Sugich Co.*, 179 Cal.App.2d 299, 309 [3 Cal.Rptr. 718]; *O'Hey* v. *Matson Navigation Co.*, 135 Cal.App.2d 819, 834 [288 P.2d 81]; *Happoldt* v. *Guardian Life Ins. Co.*, 90 Cal.App.2d 386, 399-400 [203 P.2d 55].)

*Did the Trial Court Err in Sustaining Objections to Certain Questions Asked to Show That the Intersection was a "Single Intersection" and in Refusing to Give Instructions to that Effect?*

 *No.* Defendant claims on appeal that the trial court erroneously refused to allow his witness to answer certain questions, the answers to which would establish that Grant Avenue, Broadway and Columbus Avenue constitute a

single intersection within the meaning of section 465.2.[14] The witness, Ross T. Shoaf, head of the Division of Traffic Engineering for the Department of Public Works of the City and County of San Francisco, was asked who it was that formulated the plan for regulating the traffic and placing signs and signals. He was also asked whether he had taken a traffic count at the intersection prior to establishing the crosswalks and signals. Objections to both of these questions were sustained on the grounds of irrelevancy. The rulings were correct. The statute in question is applicable only when both of two requirements are met, i.e., (1) where the ''outermost boundaries'' of two or more intersections are confined within a distance of 200 feet and (2) where ''a local authority'' has designated ''a single intersection by the installation and operation of traffic signals which may be supplemented by signs or markings. . . .'' In the instant case there was no evidence that the ''outermost boundaries'' of the intersections involved in this case are confined within a distance of 200 feet. The only evidence offered on this point was a diagram of the intersection which does not contain any measurements except a legend which informs the reader that the scale is 8 feet to the inch. There is no evidence that the diagram was drawn to actual scale nor is there any evidence in the record that measurements of the intersection were made. Moreover, the diagram does not depict the intersections involved in their entirety, i.e., it does not show the extension of Grant Avenue across Columbus Avenue in a northerly direction. The record is also void of any evidence that action was taken by the ''local authorities'' in San Francisco to create a single intersection by the installation and operation of traffic signals.[15] We take judicial notice that the Board of

---

[14]Veh. Code, § 465.2 read as follows: ''(a) When the outermost boundaries of two or more intersections are confined within a distance of 200 feet, the Department of Public Works in respect to state highways, and a local authority with respect to highways under its jurisdiction, shall have the power to designate a single intersection by the installation and operation of traffic signals which may be supplemented by signs or markings and when so designated said single intersection shall be the legal intersection for the purposes of traffic movement and regulation.

''(b) Whenever a single intersection has been designated by local authorities as set forth in (a), such authorities may designate marked crosswalks at certain locations within any said intersection or contiguous thereto, and when such marked crosswalks are established they shall constitute the only crosswalks at said intersection.''

[15]§ 64, in force at all times pertinent to this inquiry, provided as follows: '' 'Local authorities' means the legislative body of every county or municipality having authority to adopt local police regulations.''

Supervisors of the City and County of San Francisco is the local authority which adopts police regulations in San Francisco. The powers and duties of the Board of Supervisors are contained in the Charter of the City and County of San Francisco, which is judicially noticed. (*Clark* v. *City of Pasadena,* 102 Cal.App.2d 198, 200 [227 P.2d 306]; *Thompson* v. *City of Los Angeles,* 82 Cal.App.2d 45, 47 [185 P.2d 393]; see Gov. Code, §§ 50001, 50002 and 50020; San Francisco Charter, § 13.) The suggestion of defendant that the Department of Public Works is the local authority contemplated by section 465.2 is incorrect. In any event there is no evidence at all that the ''local authority'' has taken the action provided for in section 465.2. If such action and designation existed it would have been a simple matter to present evidence thereof in the court below. Moreover, section 465.2 provides that the local authority ''shall have the power to designate a single intersection *by the installation and operation of traffic signals* . . . and when so designated said single intersection shall be the legal intersection for the purposes of traffic movement and regulation.'' (Italics added.) The statute contemplates a joint or combined series of signals embracing both intersections in such a manner as to control all ''traffic movement and regulation'' by a single, coordinated set of signals. The record discloses that such signals were not installed or in operation at the intersection in question. The only traffic signals installed in the area were those at Columbus and Broadway. Grant Avenue is not controlled by traffic signals.[16]

We, accordingly, see no error or prejudice in the trial court's sustaining of the objections to the aforesaid questions. Because the evidence did not tender the issue as to the existence of a ''single intersection'' under section 465.2 there was no necessity for an instruction thereon, and the trial court was justified in refusing to give it. We are persuaded, moreover, that the instruction submitted by defendant was erroneous. It reads: ''You are instructed that the area where Grant meets Broadway and the area where Broadway crosses Columbus are both part of the same intersection

---

[16] § 92, subd. (b), provided as follows: '' '*Official traffic control signal*' means any device, whether manually, electrically or mechanically operated, by which traffic is alternately directed to stop and proceed and which is erected by authority of a public body or official having jurisdiction.''

and together constitute but one intersection. *That intersection is controlled by traffic signal lights.''* (Italics added.) There is no basis in the record for the giving of this instruction, not only because it was not established that there was a single intersection, but particularly because the record discloses that the only signals having lights were at Broadway and Columbus and there were no such lights facing Grant Avenue traffic at Broadway or at Columbus.

### *Did the Trial Court Commit Prejudicial Error in Refusing to Give Defendant's Requested Instruction No. 34?*

 *No.* The instruction in question reads as follows: ''If you find that at the time of the accident there were signs bearing the designation 'S.F.P.D.' posted at or near the intersection of Broadway and Grant, and that those signs purported to prohibit crossing at that intersection, then I instruct you that you must presume, in the absence of evidence to the contrary, that those signs were lawful and were placed there by the official act or direction of lawful authority.'' This instruction was submitted relative to the issue whether at the time the accident took place certain pedestal signs were placed in such a manner so as to indicate to plaintiffs that crossing Broadway, where they did, was prohibited. Defendant testified that a number of pedestal signs were placed across the sidewalk blocking the progress of pedestrians who would attempt to cross at that point. Defendant introduced into evidence a photograph showing the signs and two mailboxes blocking the sidewalk in approximately the same position as they were alleged to have been on the night of the accident. Plaintiffs' witnesses, on the other hand, all testified that the pedestal signs had been removed, were bunched together and wrapped with a chain, and were placed out of the way.

Based upon this conflict in the evidence the trial court gave several instructions applicable to the installation of signs by local authorities. Among these was one which reads as follows: ''When there are traffic signs upon our streets to guide traffic or to block cross-walks or to create cross-walks where none exist it's presumed that they were placed there in the manner provided for by local law.''[17] The essence of

---

[17]The remaining instructions given by the court on this subject are as follows: (We have designated them by number for convenient reference hereinafter.)

(1) ''Local authorities may authorize the installation of signs at or adjacent to an intersection in respect to any cross-walk directing that

defendant's requested instruction No. 34 was that if the jury
should find that signs were in place it must be presumed that
they were placed there lawfully. The court's instruction
included the direction to the jury that when traffic signs are
placed so as to guide traffic it is presumed that they were
placed there lawfully. A party is not entitled to have
the jury instructed in any particular language so long as the
instructions given correctly state the law. (*George* v. *Mat-
thews*, 175 Cal.App.2d 680, 684 [346 P.2d 863].) 
When an instruction requested by an appellant is not materi-
ally different from those given, it is not error to refuse those
proposed by the appellant. (*Wood* v. *Alves Service Transpor-
tation, Inc.*, 191 Cal.App.2d 723, 733 [13 Cal.Rptr. 114];
*Johnston* v. *Brother*, 190 Cal.App.2d 464, 474 [12 Cal.Rptr.
23].) We see little difference between the two instructions.
Defendant objects to the use of the word "block" in the
trial court's instruction. Defendant claims that the language
of the instruction imposed the additional requirement of
"blocking" which is not required by section 85. Defendant
asserts that the language of the instruction carried with it
the implication that a crosswalk did exist, notwithstanding
the provision in section 85 that no crosswalk shall exist where
local authorities have placed signs indicating no crossing,
and that such crosswalk would have to be "blocked" before
a pedestrian could be precluded from crossing. This argument
is untenable. The instructions must be considered together
and as a whole, because "[s]emantic analysis of a single line,
sentence or instruction without regard to the whole charge
can only result in misleading distortion." (*Johnston* v.
*Brother, supra,* p. 470; see *Gordon* v. *Aztec Brewing Co.*,
33 Cal.2d 514, 519 [203 P.2d 522].) The questioned

pedestrians shall not cross in the cross-walk so indicated.''
 (2) ''When signs are so erected it shall be unlawful for any pedes-
trian to cross a roadway at such location in the manner prohibited by
said sign.''
 (3) ''Notwithstanding the foregoing provisions of this section, there
shall not be a cross-walk where local authorities have placed signs
indicating no crossing.''
 (4) ''Local authorities in their respective jurisdictions may place and
maintain or cause to be placed and maintained such appropriate signs as
may be necessary properly to warn or guide traffic.''
 (5) ''You are instructed that traffic is defined in the Vehicle Code to
include pedestrians.''
 (6) ''The Police Commission is authorized to direct all traffic by
means of traffic control signs and shall place and maintain such traffic
control signs as may be necessary to direct or warn traffic.''

instruction was read in conjunction with the other instructions dealing with the installation of signs.[18] When considered with the other instructions, it is obvious that the subject instruction, while it might have been couched in more precise language, signifies, in context, that the jury was entitled to presume that a sign on a street, guiding traffic or obstructing a crosswalk so as to preclude the crossing thereof, was placed thereon in the manner provided for by law. This instruction thus gave defendant the benefit of the presumption he sought, i.e., "[t]hat official duty has been regularly performed;..." (Code Civ. Proc., § 1963, subd. 15.) We hold, therefore, that prejudicial error was not committed in refusing defendant's said instruction.

### *Did the Trial Court Err in Instructing the Jury on Traffic Code Section 40?*

 *No.* Defendant contends that the trial court committed error in instructing the jury on section 40 of the Traffic Code as follows: "[N]o provision of this Code requiring signs shall be enforceable against the alleged violator if at the time and place of the alleged violation the sign required by this Code is not in position and sufficiently legible to be seen by an ordinarily observant person." The court also instructed: "Now, signs erected by local authorities prohibiting the use of the cross-walk must be legible and in such position to indicate to a person of ordinary prudence that such crossing is prohibited." The claim is made by defendant that Traffic Code section 40 is in conflict with section 459.2, subdivision (b), and is therefore invalid. At the time of the accident in this case, section 459.2 provided that: "(a) The provisions of this division shall not prevent local authorities, by ordinance, from establishing crosswalks between intersections. (b) Local authorities may authorize the installation of signs at or adjacent to an intersection in respect to any crosswalk directing that pedestrians shall not cross in the crosswalk so indicated. When signs are so erected it shall be unlawful for any pedestrian to cross a roadway at such location in the manner prohibited by said sign."

Defendant relies upon the rule of *Pipoly* v. *Benson, supra,* 20 Cal.2d 366. As we have hereinbefore discussed, the principle declared in *Pipoly* is that local legislation may make new and additional regulations in aid and furtherance of general

---

[18]The instruction was read *between* the instructions we have designated as Nos. 5 and 6 in fn. 17.

law except in a field which is fully occupied by state statute. We have in this opinion pointed out that state statute has preempted the field with respect to the rights and duties of pedestrians crossing roadways, including the definition of crosswalks. This preemption precludes local legislation in this field, unless the state shall expressly authorize local legislation. Accordingly, the state may relinquish its dominant exclusive control to the extent expressly indicated by the Legislature. This right is recognized in *Pipoly* wherein it is stated that "Where the statute contains language indicating that the Legislature did not intend its regulations to be exclusive, the general rule permitting additional supplementary local regulations has been applied. [Citations.]" (P. 371.) This principle also finds expression in section 458 which at all times herein pertinent provided in part that "no local authority shall enact or enforce any ordinance on the matters covered by this division *unless expressly authorized herein.*" (Italics added.)

It is clear that the Legislature by enacting section 459.2 expressly authorized local authorities to establish crosswalks between intersections and to install signs prohibiting pedestrians from crossing at a crosswalk.[19] Defendant concedes that local authorities have the power to determine when, where and how signs, prohibiting pedestrians from crossing crosswalks, are to be placed, but contends that such authorities do not have the right to enact an ordinance defining when such signs shall be effective, so long as the signs are " 'at or adjacent to' the intersection." This contention entirely misconstrues the authorization given by the Vehicle Code and the effect of the questioned ordinance. Section 459.2, subdivision (b), authorized local authorities to place signs "directing" pedestrians not to cross at crosswalks, and further provided that it was unlawful for a pedestrian to cross at the crosswalk "prohibited" by a sign. If the local authorites may place such signs, it is only logical that they may enact an ordinance stating when and how the signs shall be effective. This they have done in the instant case. The ordinance in effect states that a sign shall not prohibit a pedestrian from crossing at a crosswalk if the sign is "not in

---

[19] § 85 also then provided in connection with its definition of a crosswalk that "Notwithstanding the foregoing provisions of this section, there shall not be a crosswalk where local authorities have placed signs indicating no crossing."

position'' and "sufficiently legible to be seen by an ordinarily observant person.'' The ordinance was not, accordingly, in conflict with the Vehicle Code and it was therefore proper to place before the jury applicable instructions relative to whether the signs were in a position to be seen and legible enough to be observed.

### Did the Trial Court Err With Respect to Defendant's Requested Instruction on Vehicle Code Section 565?

*No.* Defendant requested an instruction on section 565 as follows: "You are instructed that Vehicle Code section 21958 was in full force and effect at the time of this accident, and provided as follows: '*Intoxicated pedestrians.* It shall be unlawful for any pedestrian who is intoxicated to such an extent as to create a hazard to himself or others to walk or be upon any roadway.' " The evidence in the case was sufficient to justify the giving of this instruction. There was evidence that plaintiffs had to some degree been drinking before the accident,[20] and that neither had seen the pedestal signs nor defendant's automobile before the impact. Although intoxication was not proved, remoteness of evidence of intoxication does not make such evidence inadmissible but is a fact to be considered by the trier of facts in determining the weight of such evidence. (*Drury* v. *Hagerstrom,* 68 Cal. App.2d 742, 744 [157 P.2d 878] ; *People* v. *Collins,* 195 Cal. 325, 351 [233 P. 97].) Accordingly, it is not necessary that a state of intoxication be proved before an instruction on intoxication is proper. (*Anthony* v. *Hobbie,* 85 Cal.App 2d 798, 806 [193 P.2d 748].)

The clerk's transcript discloses, however, that the said instruction was withdrawn by defendant. The record also discloses that a motion was made by defendant before the trial judge to have the augmented clerk's transcript on appeal corrected to show that the instruction was not withdrawn, but that it was refused by the trial court. The motion was heard on conflicting affidavits by respective counsel for plaintiffs and defendant as to whether the parties had agreed in chambers to withdraw their respective instructions on intoxication. At the hearing of the motion, the trial judge

---

[20]Ong testified that he had two bourbon and water drinks at Shanghai Low, one bourbon and water at the Red Dragon, and one and one-half highballs at the Universal Café. Hom stated that he had "about four drinks" during the evening; that he had Scotch and water drinks at Shanghai Low, the Red Dragon, and the Universal Café.

recalled that he had stated that he did not believe that intoxication had been proved by either side, but that if a major point was going to be made of it he would give an intoxication instruction for both sides, and that both sides had stated that they had no intention of making a major point of it so they agreed to withdraw their instructions. The motion to correct the record was denied. As the record stands, it shows that the instruction was withdrawn. Where a transcript on appeal is certified as correct, the mere statement that errors exist therein will not establish that fact. (*Herrlich* v. *McDonald*, 72 Cal. 579 [14 P. 357].) An appellate court is controlled by the record as it finds it (*Barlow* v. *Crome*, 44 Cal.App.2d 356, 361 [112 P.2d 303]), and no extrinsic evidence will be received to contradict it. (*Brush* v. *Pacific Electric Ry. Co.*, 58 Cal.App. 501, 503 [208 P. 997]; *Newman* v. *Los Angeles Transit Lines*, 120 Cal.App.2d 685, 694 [262 P.2d 95].) Moreover, defendant does not offer this court any evidence that the record does not accurately reflect what transpired below, but argues that a "rule of probabilities" should apply. Suffice it to say probabilities are not evidence. Although this court may submit to the trial court for settlement a question of fact with regard to the correctness of the record under rules 12(b) and 12(c), California Rules of Court* (see *Verdier* v. *Verdier*, 118 Cal.App.2d 279 [257 P.2d 723]), here the question has already been before the trial court on a motion to correct, and has been adjudicated upon conflicting affidavits. Although the trial judge did not testify in the proceedings his recollection is entitled to some weight. (*Neyens* v. *Sellnow*, 202 Cal.App.2d 745, 750 [21 Cal.Rptr. 151]; *Freitas* v. *Peerless Stage, Inc.*, 108 Cal.App.2d 749, 763 [239 P.2d 671, 33 A.L.R.2d 778].) We are bound, therefore, by the record and must assume that the instruction that defendant claims was refused, was in fact withdrawn.

### *Did the Trial Court Err in Refusing to Instruct on "Looking and Not Seeing" (BAJI No. 140)?*

 *No.* Defendant submitted an instruction taken from BAJI No. 140,[21] which the trial court refused to give. The

---

[21]"General human experience justifies the inference that when one looks in the direction of an object clearly visible, he sees it, and that when he listens he hears that which is clearly audible. When there is evidence to the effect that one did look, but did not see that which was in plain sight, or that he listened, but did not hear that which he could

*Formerly Rules on Appeal, rules 12(b), 12(c).

instruction has been the subject of considerable discussion in recent years. It has been criticized as argumentative in a number of cases, in none of which, however, has it been held to be prejudicial error to give the instruction. (*Chadek* v. *Spira*, 146 Cal.App.2d 360, 366 [303 P.2d 879]; *Fabela* v. *Hargis*, 147 Cal.App.2d 809, 816-817 [305 P.2d 901].) Because it is argumentative and merely states a commonplace, it has been held, in other cases, not to be prejudicial error to refuse to give it. (*Callahan* v. *Theodore*, 145 Cal.App. 336, 339 [302 P.2d 333]; *Schwenger* v. *Gaither*, 87 Cal.App.2d 913, 914-915 [198 P.2d 108]; *Rickey* v. *Kardassakis*, 110 Cal. App.2d 291, 295 [242 P.2d 384]; *Tankersley* v. *Low & Watson Constr. Co.*, 166 Cal.App.2d 815, 822-823 [333 P.2d 765]; *Laursen* v. *Tidewater Assoc. Oil Co.*, 123 Cal.App.2d 813, 818 [268 P.2d 104]; *Glanville* v. *Cannick*, 182 Cal.App.2d 514, 517-518 [6 Cal.Rptr. 175].) The instruction was held to have been properly refused where the chief factual question to be determined was whether the object of vision was clearly visible. (*Abney* v. *Coalwell*, 200 Cal.App.2d 892, 899 [19 Cal. Rptr. 846].) On the other hand, it was not held to be error to give the instruction where the visibility of a train at a railroad crossing was an issue and where there was "overwhelming evidence" to the effect that bells were ringing, the whistle blown, the lights flashing, of the lack of obstruction down the track, plus the clear view which the plaintiffs had of the approach of the train for at from five to ten seconds. (*Akers* v. *City of Palo Alto*, 194 Cal.App.2d 109, 114 [14 Cal.Rptr. 767].)

Defendant relies upon *Rubalcaba* v. *Sweeney*, 168 Cal.App. 2d 1 [335 P.2d 157], in which it was held error to refuse the instruction. In that case Rubalcaba was struck by Sweeney's automobile while crossing the street at night in a marked crosswalk; Sweeney testified that although his lights were on high beam he did not see Rubalcaba until the moment of impact. The reviewing court held that under the particular facts of the case the instruction should have been given, and that such error, together with other errors in instructing the jury, warranted a reversal of the judgment in favor of Sweeney.

It is apparent that the consensus of authority is that in the ordinary negligence case the instruction ought not to be

---

have heard in the exercise of ordinary care, it follows that either some part of such evidence is untrue, or that the person was negligently inattentive."

given, but that no prejudice usually results either from refusing to give the instruction or from giving the instruction. It is equally clear, however, that, under circumstances peculiar to the particular case, the instruction should be given and that it may constitute prejudicial error not to give it. The present case is not one which, under the circumstances of the case, requires the instruction. The instruction most certainly would not be applicable to plaintiff Ong if the jury believed that he had no recollection of his crossing of Broadway. There is nothing in the record to indicate that he did look in the direction of defendant's route of travel. As to Hom, it was his testimony that he did look and saw that the lights at Broadway were "red," and that there were no cars headed in his direction waiting for the signal to change, and that he and Ong proceeded to cross. There is no evidence that Hom again looked in an easterly direction. Considering the distance from the westerly side of Grant Avenue to the easterly side of Columbus Avenue and the circumstance that it was nighttime, there would be some question whether defendant's car was in "plain sight" while he was waiting for the signal to change. It is significant to note that defendant himself did not see plaintiffs until they were a car length in front of him.

In addition to defining negligence, ordinary care and contributory negligence, the trial court gave instructions on a pedestrian's duty before and while crossing a street.[22] Bearing in mind that there is no continuing duty to look in directions of anticipated danger (*Francis* v. *City & County of San Francisco,* 44 Cal.2d 335, 339 [282 P.2d 496]), these instruc-

---

[22]The trial court instructed as follows:

"Before attempting to cross a street that is being used for the traffic of motor vehicles it is a pedestrian's duty to make reasonable observations, to learn the traffic conditions confronting him, to look to that vicinity from which were a vehicle approaching it would immediately endanger his passage and to try to make a sensible decision whether it is reasonably safe to attempt the crossing.

"What observations he should make and what he should do for his own safety while crossing the street are matters which the law does not attempt to regulate in detail and for all occasions, but it does place upon him the continuing duty to exercise ordinary care to avoid an accident." (Taken from BAJI No. 201-C.)

"A pedestrian is not necessarily under a continuing duty to keep looking right and left as he crosses the street; he is only under a continuing duty to exercise ordinary care in light of all the circumstances." (Apparently based on *Francis* v. *City & County of San Francisco,* 44 Cal.2d 335, 339 [282 P.2d 496].)

650

tions were adequate under the circumstances of the present case. Moreover, under these instructions, the jurors could hardly have failed to understand that in determining whether plaintiffs, or either of them, were contributorily negligent, they had to decide whether plaintiffs saw or should have seen defendant's automobile.

### Did the Trial Court Err in Refusing to Give an Instruction on Custom and Practice?

 *No.* The only evidence in the record which defendant claims would support an instruction on custom or practice consists of plaintiffs' exhibits 1-B and 1-C, which are photographs of the intersection in question showing people crossing the street in the same manner that plaintiffs crossed when they were struck by defendant's car. These pictures were taken during the daytime and subsequent to the accident. It does not appear from the record that plaintiffs sought to justify the crossing of the street by custom or practice. The photographs were presented in evidence solely for the purpose of showing generally "the scene of the accident" on the day of the accident. The issue of custom and practice was not presented as an issue during the trial, but its presence is now argued by defendant on the basis of his interpretation of the two photographs. Although the submitted instruction[23] was a correct statement of the law (see *McDonald* v. *Foster Memorial Hospital,* 170 Cal.App.2d 85, 93 [338 P.2d 607]), it was properly refused because the issue covered by the instruction was not presented during the trial. (*Harper* v. *Vallejo Housing Authority,* 104 Cal.App.2d 621, 628 [232 P.2d 262].) An instruction, even though abstractly correct should not be given where it is not supported by the evidence and where it may mislead the jury. (*Risdon* v. *Yates,* 145 Cal. 210, 217 [78 P. 641]; *Graham* v. *Mead,* 159 Cal.App.2d 301, 303 [323 P.2d 1008]; *Novak* v. *Peira,* 175 Cal.App.2d 29, 34 [345 P.2d 349].) It should be noted, moreover, evidence of custom and practice may not be used to contravene a statutory duty of care. (*Ortega* v. *Garner,* 218 Cal.App.2d 823, 827 [32 Cal.Rptr.

---

[23]The requested instruction would have advised the jury: "You are instructed that, although evidence of a custom or practice by others as to the doing of a certain act may be considered by you in determining whether a party to this action was negligent or contributorily negligent in his conduct, a custom or practice by others of violating a statute, ordinance or regulation will not excuse such violation by a party to this action."

632]; *Hurtel* v. *Albert Cohn, Inc.,* 5 Cal.2d 145, 148-149 [52 P.2d 922]; Witkin, Cal.Evidence, p. 170.)

*Did the Trial Court Err in its Instruction on the Presumption of Due Care?*

 *No.* The trial court gave the following instruction: "If you find that Paul H. Ong, Plaintiff in this case, suffered a loss of memory so as to be unable to testify as to his conduct at the time of and immediately preceding the accident here in question then I instruct you that the law presumes that Paul H. Ong in his conduct at the time of and immediately preceding the accident was exercising ordinary care and was obeying the law."[24] It is claimed by defendant that this instruction is erroneous because it omitted the important qualification that the loss of memory must have been the result of the accident. The contention is made by defendant that if Ong did have a loss of memory it was due to his drinking activities on the night of the accident rather than the accident itself.

Ong testified as to the events of the evening of the accident, including his walking up Grant Avenue towards Broadway. He also testified as to the establishments which he and Hom had visited during the evening, and that he had had a total of four and one-half bourbon and water drinks at these places. He stated that the last memory he had of the events of the evening was walking across Pacific Avenue on Grant Avenue. (This intersection is one block south of the intersection of Broadway and Grant Avenue.) He testified further that he did not have any recollection of being struck by a car; or of lying in the roadway on Broadway; or of being taken to the emergency hospital; or of being in the emergency hospital; or of talking to any police officer; or of being taken from the emergency hospital to the Chinese Hospital. His testimony was that the first thing he next remembered after crossing Pacific Avenue at Grant Avenue was that the "next morning" he was in the Chinese Hospital. Police Officer Petty testified that he had a conversation with Ong at the emergency hospital wherein he answered questions either by a nod of the head, or a "yes" or "no" answer. A doctor who examined Ong at 7 a.m. on the morning of the accident testified that he was in severe shock and that he was semiconscious. No medical or other expert evidence was adduced at the trial as to the cause of Ong's loss of memory.

[24]This instruction is BAJI No. 135-B contained in the 1959 pocket part.

Defendant argues that the evidence was sufficient to support an inference that Ong's loss of memory was caused by the ingestion of the alcoholic drinks on the night of the accident. Plaintiff Ong asserts, on the other hand, that there is no evidence of intoxication or loss of memory as a result of intoxication, and that the only reasonable inference that can be drawn is that the loss of memory was caused by the accident.

The presumption under discussion finds its basis in section 1963 of the Code of Civil Procedure providing for disputable presumptions, wherein it is provided: "The following are of that kind:... 4. That a person takes ordinary care of his own concerns;..." In *Scott* v. *Burke* (1952) 39 Cal.2d 388 [247 P.2d 313], the rule applying said presumption, in a case where there is a loss of memory, is declared to be as follows: One who by reason of loss of memory is unable to testify concerning his conduct at and immediately before the time of an accident is entitled to invoke the presumption that he exercised ordinary care for his own concerns, subject to the exception that such presumption is dispelled by evidence introduced by such party which is wholly irreconcilable therewith. In *Scott*, the defendant testified that he had no recollection whatsoever of the accident and could not explain why it occurred; that his first recollection thereafter was opening his eyes behind the wheel, and the last recollection he had of any event prior thereto was of his driving of the car between Nogales and Tucson. There was evidence that he was rendered temporarily unconscious by the accident and suffered a concussion of the brain and injuries to his head. Medical evidence was introduced to the effect that one who is knocked unconscious by a blow on the head may suffer retrograde amnesia by which his memory of events immediately preceding his unconsciousness may be obliterated for a period of from a few seconds to a number of hours, and that under such circumstances the injured person would be unable to recall any of the events which happened during the period of the blackout of his memory by such amnesia. The Supreme Court there held that the presumption in question was applicable and that the instruction given by the trial court was proper. That instruction was that "if the jury believed that defendant as a result of the shock of the accident was unable to remember and testify as to his own conduct or other facts of the accident then a presumption arose that he, was obeying the law and was exercising ordinary care and doing such acts as an ordinarily prudent person would have done

in the same circumstances.' '' (P. 393.)

Although the rule declared in *Scott* would appear to apply even though the loss of memory resulted from some reason other than the accident which is the subject of the action, cases decided after *Scott* have made it clear that the presumption applies in favor of one suffering loss of memory of an accident *only* when his amnesia was caused by the accident. (*Gioldi* v. *Sartorio* (1953) 119 Cal.App.2d 198, 201 [259 P.2d 62] ; *Bergman* v. *Bierman* (1956) 138 Cal.App.2d 692, 695-696 [292 P.2d 623] ; *Kumelauskas* v. *Cozzi* (1959) 173 Cal. App.2d 541, 545 [343 P.2d 605] ; *Smith* v. *Sugich Co., supra,* (1960) 179 Cal.App.2d 299, 312 ; *Johnson* v. *Popso* (1961) 194 Cal.App.2d 449 [14 Cal.Rptr. 834] ; *Klein* v. *Southern Pac. Co.* (1962) 203 Cal.App.2d 72 [21 Cal.Rptr. 233] ; see also *Hensley* v. *Harris,* 151 Cal.App.2d 821, 825 [312 P.2d 414].)[25]

In *Gioldi,* the plaintiff testified that she had no recollection of anything which occurred between the night before her injuries and sometime after the accident when she found herself in the hospital. The opinion does not indicate that there was any other evidence as to the cause of the loss of memory. The reviewing court there cited the above rule declared by *Scott,* but held proper an instruction on presumption of care because the trial court had carefully qualified the instruction by making it applicable only if the loss of memory resulted from the accident. Likewise, in *Bergman,* the plaintiff testified she started to walk across the street in a crosswalk, after she looked and saw no automobiles ; that she had no recollection of the accident and the next thing she recalled after starting across the street was being in bed in a hospital. In holding the presumption applicable the appellate court stated : "It is the law that such causation [loss of memory as a result of the accident] must be present to bring the presumption into play [citations]." (P. 696.)

In *Kumelauskas,* the plaintiff testified he had no recollection whatsoever of the accident and could not explain why or how it occurred ; that the day before the accident he left his home to go to his union to get a job and the next thing he remembered was waking up in the hospital. There was no medical evidence adduced as to the cause of his loss of memory. The

[25]A petition for a hearing in the Supreme Court was made in *Gioldi, Hensley, Kumelauskas* and *Johnson,* and in each instance the petition was denied.

trial court instructed the jury that the plaintiff was entitled to the presumption of due care, but did not instruct that they were first to find whether the plaintiff had suffered a loss of memory, or that the loss of memory was a result of the accident. In reversing a judgment for the plaintiff the reviewing court held that the instructions should have been conditioned on the jury's believing that as a result of the accident the plaintiff lost his memory as to his acts and conduct at and immediately before the time of the accident, the court stating in its opinion: "It is a question of fact whether plaintiff sustained a loss of memory as a result of the accident. [Citations.]" (P. 546.) In *Smith,* the plaintiff testified that he remembered nothing after taking three steps south of the center line until he came to lying in the street. There was evidence that the plaintiff was unconscious after the impact. The reviewing court there approved an instruction conditioned upon a loss of memory as a result of the accident stating, "The question for the jury was merely whether he was deprived of his memory of any of the events as a result of the injury." (P. 312; citing *Kumelauskas* v. *Cozzi, supra.*)

In *Johnson,* it was held not to be error to refuse an instruction identical to the one given in the instant case because it "*did not state the law correctly....*" (P. 456.) In that case a minor plaintiff who was 5 years and 9 months old at the time of the accident and nearly 8 at the time of trial, testified that he remembered that he was hurt in 1956 or 1957; that he was hit by a car; that he could not remember where he was hurt nor anything about how he was hurt. There was testimony that he was unconscious at the hospital and that he sustained a slight to moderate concussion. The appellate court there recapitulated and summarized the general rule in this state applicable to instructions on the presumption of due care as follows: "It is well settled in this state that those who, because of loss of memory *due to the accident* are unable to testify as to their activities immediately preceding and at the time of the accident are, with certain qualifications, entitled to an instruction that they are presumed to have exercised reasonable care. [Citations.] This presumption is evidence, and as such can be weighed together with other evidence. [Citation.] But it is equally well settled that one is entitled to the presumption only (1) where the loss of memory is a result of the accident on which he bases his claim [citations]; and (2) where the party seeking the benefit of the presumption has not presented testimony which is wholly

irreconcilable with the presumption."[26] (Pp. 454-455; italics added.)

In *Klein,* the presumption was held applicable in a railroad crossing accident where the plaintiffs, who were guest passengers in an automobile which was struck by a train, had no recollection of the accident or any of the circumstances preceding it. The opinion does not disclose the nature of the evidence as to loss of memory but does state that the conditions precedent set out in *Johnson* v. *Popso, supra,* were fully satisfied. It should be noted that in *Klein* the trial court gave an instruction which did not specifically state that the loss of memory must result from the accident. The appellate court pointed out that the instruction was "not technically correct" because it should have been conditioned on the jury's believing that as a result of the accident the plaintiffs lost their memory as to the acts and conduct at and immediately before the time of the accident. (Fn. 2, pp. 76-77.) The reviewing court held, however, that the defendants were not prejudiced because they did not object on the ground of the above deficiency, and because it appeared from the record that the plaintiffs' inability to testify was a result of the accident.

An instruction similar to the one in the instant case was given in *Fultz* v. *Griffin,* 197 Cal.App.2d 397 [17 Cal.Rptr. 385], a case wherein a plaintiff pedestrian was struck by an automobile. The plaintiff there testified that he did not remember any of the events of the accident, and that the last thing he remembered was that shortly after 10 o'clock on the evening before the accident he stopped at the " 'Rumpus Room' " and " 'had a couple of drinks' " and then got into a taxicab. The medical testimony was in conflict as to whether the plaintiff's amnesia could have resulted from the injuries sustained in the accident. In affirming a judgment for the defendant the court noted that the said instruction was "more favorable to plaintiff than he was entitled to, since the medical witness agreed that loss of memory could be caused by ingestion of alcohol or fatigue, as well as by trauma." (P. 403.)

---

[26]The reviewing court took note, in footnote 2 on page 455, that The Committee on BAJI had recommended to the judges of the superior court that BAJI No. 135-B (1959 pocket part) be modified so that the words "as a result of the accident" would follow the word "case." It should be noted here that the recommendation has been followed in BAJI No. 135-B (New, 1962 pocket part).

A case worthy of note is *Hughes* v. *City & County of San Francisco* (1958) 158 Cal.App.2d 419 [322 P.2d 623]. There the plaintiff, an 89-year-old pedestrian, was injured when struck by a trolley bus, and while convalescing in a nursing home from the injuries caused to her right leg by the accident, she fell and broke her left hip. There was evidence that she began to mentally deteriorate about the time of this fall, either because of her physical condition or her age. A judgment for the defendant was reversed because the trial court gave an instruction that each party was entitled to a presumption of due care. The reviewing court held, however, "that under the circumstances of the accident" the plaintiff was entitled to the presumption of due care. (P. 425.)

In *Gigliotti* v. *Nunes* (1955) 45 Cal.2d 85 [286 P.2d 809], the Supreme Court, in holding the presumption of due care applicable to the conduct of a deceased driver, relied upon the general rule declared in *Scott,* and stated as follows: "The benefit of the presumption has frequently been held available to plaintiffs in wrongful death actions [citations], as well as to one who by reason of loss of memory is unable to testify concerning his conduct at and immediately before the time of the accident. (See *Scott* v. *Burke* (1952), *supra,* 39 Cal.2d 388, 394, and cases there cited.)" (P. 93.) The Supreme Court did not amplify upon the rule as applied to loss of memory cases because it was not there called upon to do so. *Gigliotti* is significant for its holding that a party relying on the presumption is not deprived of it because other parties testify fully as to the acts and conduct of the allegedly negligent person, unless the testimony which he himself produces under circumstances which afford no indication that the testimony is the product of mistake or inadvertence is wholly irreconcilable with the presumption sought to be invoked.

We are satisfied that it is the settled law in this state that one is not entitled to the presumption of due care unless the loss of memory is the result of the accident upon which he bases his claim. Accordingly, the instruction given in the case at bench was erroneous. The question remains, however, whether the error was prejudicial. In the instant case, unlike the situation in *Fultz,* there was no issue raised as to whether Ong's loss of memory was caused by his ingestion of alcohol; nor was any evidence presented that such was the case. The evidence on the subject of drinking merely discloses that Ong consumed four and one-half drinks of an alcoholic beverage in the course of the night prior to the accident. There was no evidence of intoxication. The emer-

gency hospital records disclose that he was "sober" on admission; and the hospital witness testified that ordinarily two entries are made with respect to sobriety, and that these are: "alcoholic breath" and "sober."

In addition to the shock and semiconscious condition here-inbefore referred to, the record discloses that Ong suffered severe injuries consisting of internal injuries and fractures of the pelvic bones and spine. There is also evidence that as a result of the collision Ong was thrown a distance of 71 feet from the point of impact. Ong himself testified that he regained "consciousness" at the Chinese Hospital. In the light of the foregoing cases, we are satisfied that there was ample evidence from which the jury could infer that Ong's loss of memory was caused by the accident. The instruction under scrutiny submitted to the jury the factual issue as to whether Ong suffered a loss of memory. While the instruction did not contain the qualification that the loss of memory must result from the accident, we are of the opinion that under the circumstances of the case, the only reasonable inference that could be drawn by the jury, if it believed that Ong suffered a loss of memory concerning his activities immediately preceding and at the time of the accident, was that the loss of memory was caused by the subject accident. We are satisfied, moreover, that the jury must have understood that Ong was claiming a loss of memory as the result of his injuries and that this was the issue for them to decide. It should be noted, in this regard, that the questioned instruction is worded in the past tense, i.e., whether Ong "*suffered* a loss of memory so as to be unable to testify as to his conduct at the time of and immediately preceding the accident here in question...." (Italics added.) The connotation of this language was sufficient, we believe, to indicate to the jury that the presumption was only applicable if there was a causal connection between the claimed loss of memory and the accident.

In *Bergman,* it was held that the proof of the accident as the cause of the loss of memory was sufficient where the plaintiff testified she had no recollection of the accident and where the record disclosed that she had sustained severe injuries and a concussion of the brain. The appellate court there stated: "The record at bar does not justify a holding as matter of law that plaintiff ... did not also suffer a loss of memory (retrograde amnesia) covering the period from the time that she started across the street until after the accident

had occurred. There is nothing in the record to refute or throw doubt upon her testimony in this regard." (P. 696 of 138 Cal.App.2d.) Similarly, in *Hensley,* where a loss of memory of the accident was claimed, it was held that the presumption was not lost because the party invoking the presumption admitted he did not lose consciousness at any time and because he gave a detailed report to a police officer immediately following the accident. The appellate court there made this pertinent statement: "If the jury had believed the testimony of Harris it would not have been unreasonable to conclude therefrom that he had in fact suffered a loss of memory as to what took place while he was traveling the last 50 feet before the collision, and defendants would have been entitled to the benefit of the presumption." (P. 824 of 151 Cal.App. 2d; citing *Scott* v. *Burke, supra.*)

Defendant places considerable reliance upon *Kumelauskas* where there was evidence that the plaintiff, a pedestrian, had consumed at least two whiskey drinks, that he stood in the midst of traffic swearing at passing motorists and attempted to direct them, and that both at the scene of the accident and at the receiving hospital he had " 'a very strong odor of alcohol' " on his breath. (P. 547 of 173 Cal.App.2d.) That case is distinguishable from the present case primarily because, as we have hereinbefore pointed out, the fact issue as to whether the plaintiff sustained a loss of memory was not submitted to the jury at all. It is also apparent that the reviewing court was not there alluding to any issue as to whether the loss of memory was caused by the ingestion of alcohol, but whether the plaintiff's conduct threw "doubt on plaintiff's testimony with respect to his loss of memory" in view of the sharp conflict in the evidence as to the circumstances of the accident. (P. 546.) The reversal was there predicated upon the basis that the instruction as given "might well have led the jury to believe that they were to accept plaintiff's testimony respecting his loss of memory as true," when the jury might have disbelieved the evidence with respect to plaintiff's loss of memory and believe the testimony to the effect that he did not sustain such loss. (P. 547.)

Under all of the circumstances of the present case we are constrained to hold that the instruction as given did not mislead the jury and that therefore the error has not been so prejudicial as to require a reversal. (See *Butigan* v. *Yellow Cab Co.,* 49 Cal.2d 652, 660-661 [320 P.2d 500, 65 A.L.R.2d 1].)

In connection with the question of loss of memory defendant submitted two instructions which the trial court refused to give. These instructions were to the effect that loss of memory could not be relied upon because Ong was familiar with the intersection where the accident happened and because he was crossing Broadway in violation of traffic regulations prohibiting such crossing.[27] These instructions were clearly erroneous. If plaintiff Ong was entitled to the presumption it applied whether he was familiar with the intersection or not, or whether he was violating a statute or ordinance or not. The rule is well established in California that presumptions constitute independent evidence to be weighed against other evidence. (*Smellie* v. *Southern Pacific Co.*, 212 Cal. 540, 549-559 [299 P. 529]; *Westberg* v. *Willde*, 14 Cal.2d 360, 365 [94 P.2d 590]; *Scott* v. *Burke, supra,* at p. 394.) The fact that Ong may have been familiar with the intersection is only evidence which may be weighed against the presumption. It is not such evidence as dispels the presumption as a matter of law. "Generally speaking, . . . a presumption is dispelled as a matter of law only when a fact which is wholly irreconcilable with it is proved by the uncontradicted testimony of the party relying on it or of such party's own witnesses." (*Leonard* v. *Watsonville Community Hospital*, 47 Cal.2d 509, 517 [305 P.2d 36] (italics omitted); *Mar Shee* v. *Maryland Assurance Corp.*, 190 Cal. 1, 9 [210 P. 269].)[28] Accordingly, even evidence of violation of a statute will not dispel the presumption because such violation is not "wholly irreconcilable" with the presumption that the person invoking the presumption exercised due care

---

[27]The said instructions read as follows: "It has been stipulated by the plaintiff Ong through his attorney that said plaintiff was familiar with the intersection where the accident happened for some period of time before the accident. A loss of memory, if any, concerning events which occurred at or immediately before the accident cannot be relied upon by the plaintiff Ong to eliminate the effect of this stipulation."

"If you find that the plaintiff Ong was crossing Broadway in violation of a traffic regulation prohibiting such crossing, then I instruct you that a loss of memory, if any, could not be relied upon by such plaintiff to dispute such a fact, if it be a fact, that he was so crossing."

[28]The exception to this rule is where the opposing evidence is absolutely conclusive. The general rule is also subject to the qualification that where testimony of the party relying on the presumption or of his witnesses is the product of mistake or inadvertence, such testimony will not operate to dispel the presumption. (See *Leonard* v. *Watsonville Community Hospital, supra,* fn. 4, p. 517.)

for his own safety. (See *Heffington* v. *Paul,* 152 Cal.App.2d 235, 238 [313 P.2d 157, 67 A.L.R.2d 113] ; *Norton* v. *Futrell,* 149 Cal.App.2d 586, 590 [308 P.2d 887].) A violation of statute may not be the proximate cause of the injury. (*Pierce* v. *Black,* 131 Cal.App.2d 521, 527 [280 P.2d 913] ; *Green* v. *Menveg Properties, Inc.,* 126 Cal.App.2d 1, 11 [271 P.2d 544].) ▉ Moreover, the presumption of negligence arising from a violation of statute is not conclusive but may be overcome by other evidence showing that under all the circumstances surrounding the event, the conduct in question was excusable or justifiable. (*Alarid* v. *Vanier,* 50 Cal.2d 617, 621 [327 P.2d 897].) ▉ It was for the jury, in the light of all the circumstances of the case in evidence before them, to determine whether either of the presumptions were present, i.e., the presumption of due care and the presumption of negligence ; and if they were both present to weigh one against the other and to resolve the issues in accordance with the rules relating to burden of proof. (See *Scott* v. *Burke, supra,* p. 399 ; *People* v. *Burke,* 43 Cal.App.2d 316, 318 [110 P.2d 685] ; and see *People* v. *Hewlett,* 108 Cal.App.2d 358, 373-374 [239 P.2d 150].)

### *Did the Trial Court Commit Prejudicial Error in Rejecting Defendant's Offer of Proof Made Through Police Officer Vogelsang?*

▉ *No.* Officer Vogelsang testified in chambers outside the presence of the jury that the purpose of the police department in putting up signs that said " 'do not cross' " at the southwest corner of Grant and Broadway was "[t]o discourage pedestrians from crossing there"; that if he were driving an automobile there, he would not expect a pedestrian to cross at Grant Avenue ; that their purpose in putting up signs was to protect pedestrians from the signal situation at Broadway and Columbus ; that it is his conclusion that pedestrians are not supposed to cross there ; that there is not an unmarked crosswalk across Broadway from the west side of Grant ; and that he and the police department classify Grant Avenue as an "alley," an "alley" being a street with "under 30 feet of road width." What we have hereinabove said in our discussion of the term "alley" is applicable here. As to the other questions they clearly called for the opinion and conclusion of the witness. Whether an unmarked crosswalk existed or not was a question of law. The trial court was correct in rejecting the proffered testimony.

*Did the Trial Court Err in Refusing Defendant's*
*Requested Instructions on Damages?*

██ *No.* The requested instructions[29] would have advised the jury that in the event they decided for plaintiffs their verdict should not make an allowance for attorneys' fees, and that in estimating the amount of damages they are not entitled to consider how much they would be willing to take to be placed in the same position as plaintiffs. Defendant cites no authority which holds that it is prejudicial error to refuse to give such instructions. ██ It is his duty to support his claims by citation of authority and this court is not obliged to perform that duty for him. (*Estate of Hoffman,* 213 Cal.App.2d 635, 639 [29 Cal.Rptr. 60]; *Givens* v. *Southern Pacific Co.,* 194 Cal.App.2d 39, 48 [14 Cal.Rptr. 736].)

██ Suffice it to say, the record discloses that the trial court gave extensive and adequate instructions on damages. The jury was instructed on the measure of damages, the items thereof, and upon damages for pain and suffering. The jury was also instructed that it was not permitted to allow speculative damages. A reading of the instructions discloses that the jury was fully and correctly instructed upon this question, and that the giving of the instructions requested in addition to the others given was unnecessary. All that was required of the trial court was that the jury be fully and fairly instructed on the question of damages. (*Risley* v. *Lenwell,* 129 Cal.App.2d 608, 655 [277 P.2d 897]; *Newton* v. *Thomas,* 137 Cal.App.2d 748, 767-768 [291 P.2d 503].)

The judgment is affirmed.

Bray, P. J., and Sullivan, J., concurred.

A petition for a rehearing was denied November 20, 1963, and appellant's petition for a hearing by the Supreme Court was denied December 18, 1963.

---

[29]Defendant's Nos. 41 and 42.