[Civ. No. 45935. Second Dist., Div. Five. Sept. 24, 1975.]

JAMES J. MUZNIK, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD,
COUNTY OF LOS ANGELES et al., Respondents.

**COUNSEL**

Louis R. Stein for Petitioner.

John H. Larson, County Counsel, Milton J. Litvin and Michael D. Ford, Deputy County Counsel, T. Groezinger, James J. Vonk, George S. Bjornsen and Robert A. La Porta for Respondents.

**OPINION**

**STEPHENS, Acting P. J.**—Petitioner seeks review of a Workers' Compensation Appeals Board order of February 14, 1975 which adopted the findings and report of the workers' compensation judge. By this action the board held that petitioner's injury was not "heart trouble" and therefore not within section 3212 of the California Labor Code.[1]

---

[1]Labor Code section 3212 provides in pertinent part:

"In the case of members of . . . fire departments of . . . counties . . . except those whose principal duties are clerical, . . . the term 'injury' includes . . . heart trouble which develops or manifests itself during a period while such member is in the service of such office, staff, department or unit. . . . [¶] Such . . . heart trouble . . . so developing or manifesting itself in such cases shall be presumed to arise out of and in the course of the employment. This presumption is disputable and may be controverted by other evidence, but unless so controverted, the appeals board is bound to find in accordance with it. [¶] Such . . . heart trouble . . . so developing or manifesting itself . . . shall in no case be attributed to any disease existing prior to such development or manifestation."

Petitioner contends that the order was neither reasonable nor supported by substantial evidence in light of the entire record. Respondents in this case include the County of Los Angeles and the State Compensation Insurance Fund. Each has filed an answer to this petition.

*Facts*

Petitioner was born in 1916. Before beginning employment with the county fire department, petitioner underwent a pre-employment physical examination. He passed. The outcome of the examination enabled petitioner to begin work as a fireman in 1940. During the first three years of his employment, petitioner served as a fireman, and subsequently, as an acting captain. For the remainder of his 33-year career, petitioner worked primarily as an engineer. In these positions petitioner undertook the usual duties and was exposed to chemicals, smoke, debris, chlorine gas, methane foam, and exhaust noise. He was involved in extinguishing various types of fires, including chemical, brush, explosive, and oil fires. He also drove ladder and rescue trucks. His work was performed sometimes during the day and sometimes at night and regardless of weather conditions. He was exposed to the tensions accompanying fire-fighting. During this same period, petitioner occasionally was involved in part-time work as a machinist, an auto and motorcycle parts salesman, and a race-car mechanic.

Petitioner continued his duties as a county fireman until May 19, 1973. He was taken off the job at that time as a result of becoming ill while working at a fire in a three-story apartment house on May 3, 1973. On that date, while the work was nearing completion and petitioner was helping with the hose, ladders, salvage, and ventilation, he became dizzy and fell. As a result of this incident, petitioner was placed under the care of William H. Allen, M.D., who was provided by respondent county, and who continues as petitioner's treating physician. Petitioner complains that he gets upset easily, that he has constant ringing in his ear, that he suffers from nervousness, sleeplessness, dizziness, nausea, shortness of breath, and perspiration. To control these conditions, Dr. Allen has prescribed medication which requires petitioner to take three different kinds of pills four times a day, and a "nerve" pill to enable petitioner to relax when he becomes upset. Petitioner follows his doctor's instructions regarding lifting and relaxation, plays a little golf, mows the lawn with an electric mower, and does some work in his hobby shop. Petitioner was officially retired on July 17, 1973. Although he is unable to return to his work as a fireman, petitioner thinks he could perform a part-time job that is not completely sedentary.

## Medical Evidence

The medical evidence before the board consisted primarily of the reports and testimony of three well-qualified physicians: William H. Allen, M.D. (the treating physician), Reuben Merliss, M.D. (engaged by petitioner's attorney), and Morton Kritzer, M.D. (specialist in internal medicine and agreed medical examiner in the case). The medical evidence centered on the three issues to be considered on this review: (1) nature of petitioner's disability; (2) apportionment of the disability; and (3) extent of the disability.

### Nature of Petitioner's Disability:

Dr. Allen submitted a report of petitioner's physical condition on August 3, 1973. The report represented the first comprehensive examination of petitioner after the injury of May 3, 1973 which had prevented him from continuing as a fireman. On the basis of his examination, the doctor stated that petitioner was suffering from severe hypertension (generally, high blood pressure) which was of unknown etiology and was subject to aggravation by minimal exercise or stress. This condition was first recorded by the "Occupational Health Service" in 1966 but, according to Dr. Allen, remained asymptomatic for the most part until the incident on May 3, 1973.

A treadmill test performed by Dr. Allen revealed not only a very "inordinate" blood pressure response to exercise, but ventricular irritability as well. His other objective findings included calcification in petitioner's iliac arteries, which process had commenced two years prior to the examination; an enlarged thoracic aorta; some occlusive aortic arch disease; and a murmur in the chest area.[2] Dr. Allen indicated that these findings suggested generalized arteriosclerotic cardiovascular disease which also probably included significant coronary atherosclerosis. In a subsequent report of December 17, 1973, Dr. Allen concluded that this condition has been aggravated by both petitioner's employment and his hypertension. Due to the effect of exercise and stress on petitioner's condition, Dr. Allen felt that petitioner should not return to work as a fireman.

---

[2] According to Dorland's Illustrated Medical Dictionary (1965, 24th ed.), the ventricle is one of the lower chambers of the heart, and the aorta is the main trunk from which the systemic arterial system proceeds. The aorta arises from the left ventricle of the heart.

Three reports of Dr. Reuben Merliss were also admitted into evidence. In addition to his statement of agreement with Dr. Allen's assessment of petitioner's condition, Dr. Merliss, in all three of his reports, disclosed his findings of an abnormal electrocardiogram and his conclusion that petitioner's symptoms were not only generally indicative of hypertension, but, more specifically, of hypertensive and arteriosclerotic coronary artery disease. He also concluded that petitioner would require lifetime medical care for his heart. Dr. Merliss' final report of November 22, 1974 contained a lengthy description of hypertension and its relation to the heart. Initially, he stated that hypertension is usually defined as a "cardiovascular" disease. Further:

"It can be produced and probably most commonly is by constrictions of the peripheral blood vessels, thereby decreasing the arterial bed, and increasing the pressure of the blood within it. This immediately and by direct mechanical action increases the pressure in the chambers of the heart, and requires the heart to do extra work. No hypertension can be peripheral except under bizarre or unusual circumstances . . . [¶] When hypertension persists for any length of time it is almost without exception associated with heart disease. It is the single greatest and most important factor in the production of coronary artery disease. . . . [¶] . . . If hypertension can be reduced by any mechanism, cardiac work falls; and by the mere process of lowering the blood pressure in a man by giving him the right kind of pills, one can decrease the size of the heart . . . [¶] . . . [Hypertension] is associated with functional alterations of the heart and its pressures from the very beginning."

On May 21, 1974, Dr. Morton Kritzer, the agreed medical examiner, examined petitioner. In his report of June 14, 1974 (also stated to be a "compendium" of the report of Dr. Allen), Dr. Kritzer listed the following medical history of petitioner: "1. Nervousness, jumpiness, easy irritability. 2. With nervousness or excessive exercise, has ringing in left ear and breaks out into a sweat. 3. No other cardiovascular complaints." On the basis of his examination, Dr. Kritzer's impression was that petitioner had essential hypertension. Although Dr. Kritzer restated that petitioner's stress treadmill test showed ventricular irritability and that such might possibly be indicative of minimal coronary arteriosclerotic heart disease, he concluded that there was no present evidence of coronary artery heart disease. He characterized the development of the ventricular ectopy (i.e., displacement) as the only "cardiac" finding. He added that such finding could be "suggestive but not completely diagnostic of coronary artery heart disease." Dr. Kritzer's examination

also revealed a murmur along the "left sternal border and up into the aortic area"; he concluded that it did not indicate either enlargement of the heart or electrocardiographic abnormality. The doctor also acknowledged that the patient had a history of a widened aorta and calcification of both iliac arteries. He concluded that the arteriosclerotic and hypertensive condition of petitioner was permanent and stationary.

In his testimony of August 6, 1974, Dr. Kritzer was able to expand on his findings. He agreed with Dr. Allen as to petitioner's particular symptoms (i.e., the calcification in the iliac arteries, the occlusive aortic arteriosclerosis disease, and the murmur in the chest area), and as to petitioner's suffering from moderately severe hypertension. He did not agree either with Dr. Allen's conclusion that such symptoms were suggestive of generalized arteriosclerotic cardiovascular disease or that there was any objective evidence of coronary artery disease at the time of his examination of petitioner. In Dr. Kritzer's opinion, such symptoms indicated arteriosclerosis of the aorta and the iliac arteries, but did not indicate any involvement of the coronary vessels. The latter was merely a possibility.

As to petitioner's arteriosclerotic condition, Dr. Kritzer denied that there is any relationship between the iliac arteries and the heart. He defined an artery as a "method of taking blood from the heart to the peripheral portion of the body." He stated that in the absence of symptoms of heart disease or of some "type of cardiovascular deficit" during stressful periods, the only means of aggravating arteriosclerosis was through aggravation of hypertension. Dr. Kritzer also testified that although coronary artery disease does not have any effect on high blood pressure, hypertension does increase arteriosclerosis "not only in the coronary vessel but every vessel."

Dr. Kritzer defined ventricular irritability as "skipped beats" which might occur with or without heart disease. In correlating petitioner's high blood pressure (hypertension) with this affliction, Dr. Kritzer stated: "The problem really is that with the exercise the one thing that does happen to him is that his blood pressure, it goes up. It goes up really quickly. That is what stopped the test, Dr. Allen's test. It was stopped because he was showing signs of insufficiency which caused him to skip beats."

Finally, although Dr. Kritzer stated that the electrocardiogram sent to him was normal and that of Dr. Allen was also normal except for the

skipped beats manifested upon exercise, he did testify that the electrocardiogram submitted by Dr. Merliss was "suspiciously abnormal." Due to this inconsistency in tests, Dr. Kritzer agreed that additional testing would be required for him to complete his opinion as he could not "completely rule out the fact that [petitioner] might have coronary artery disease."

In addition to the preceding medical evidence, a radiological report of Charles E. Weinstein, M.D., was admitted. It revealed that petitioner's heart was of normal size and that his chest was also normal.

*Apportionment of the Disability:*

Both Dr. Allen and Dr. Kritzer agreed that although petitioner's hypertension was probably not caused by his work as a fireman, it had been consistently aggravated by that occupation. Dr. Allen observed that during the period from 1966 to 1973, the hypertension had been aggravated by the stress and strain which petitioner had experienced in his employment. Dr. Allen estimated that petitioner's disability was "50% due to the natural progression of his underlying disease process, and 50% due to the aggravation of his employment." Further, the doctor noted that, uncontrolled, the hypertension could and did contribute to the acceleration of petitioner's arteriosclerosis.

Dr. Kritzer also felt that 50 percent of petitioner's permanent disability should be charged to nonindustrial factors. However, he observed that: "No matter what caused it, whether his occupation or what, his disability remains the same. It is a prophylactic disability. He shouldn't permit his blood pressure to go up too high, and if it does it will give you trouble in the future." Additionally, Dr. Kritzer noted that if petitioner had had normal blood pressure when he started as a fireman, it could be concluded that at that time he could not have been suffering from hypertension.

*Extent of the Disability:*

All three doctors agreed that petitioner's continued employment as a fireman was contraindicated. Although Dr. Merliss felt that petitioner could perform only semi-sedentary work in an atmosphere free of tension, Dr. Kritzer was of the opinion that petitioner was capable of light work in a nonemotionally trying atmosphere (words of art in the workers' compensation field with whose meaning Dr. Kritzer was

familiar). Dr. Kritzer indicated that petitioner should avoid involvement in emotionally traumatic work situations, but that he could tolerate standing and light activity.

Dr. Allen similarly assessed petitioner's work capacity in his report of December 17, 1973, in which he stated: "Work limitations for the future would be finding him some type of employment and job rehabilitation which would involve a 40 hour week with minimal physical requirements, although he could walk as much as necessary. . . . As much as possible it should be a job with minimal emotional stress."

After receiving this medical evidence, the workers' compensation judge formulated the rating instructions as follows: "Hypertension restricts applicant to light work in a non-emotionally trying atmosphere. Apportion 50% of the disability to the injury herein. Not to be apportioned is constant slight tinnitus."

The overall rating *after apportionment* was 39.25 percent, including 2.2 percent representing the unapportioned slight tinnitus (ringing in the ear). The workers' compensation judge found in accordance with this recommended rating and based his decision on "Doctor Kritzer's detailed and convincing evaluation."

Thereafter, petitioner sought reconsideration. The petition was denied by the board, and the report of the workers' compensation judge was incorporated and adopted in the board's order. That report stated in pertinent part: "[I]t was determined that over the period of his employment as a fireman, applicant's underlying, progressive, non-industrial hypertension was aggravated by his employment, the degree of which was established by the respected evaluation of the Agreed Medical Examiner, Doctor Kritzer. By the same evaluation, it was determined that the permanent disability was not from heart disease. . . . [¶] Doctor Kritzer summed up his evaluation at page 7 of his report and in his testimony on August 6, 1974. Then, *inter alia*, Doctor Kritzer explained that arteriosclerosis itself has no effect on hypertension. [¶] The presumption of Labor Code 3212 is that heart trouble arose out of and in the course of employment. The presumption is not that any heart trouble is present in the first place. [¶] Again as Doctor Kritzer explained on August 6, 1974, being a fireman does not cause the progressive hypertension, but it can, and did in this case, increase the disability from the hypertension. [¶] Overall, as Doctor Kritzer explained, applicant could tolerate long standing or sitting with his prophylactic restriction to light work activities. Applicant is nowhere near total disability."

*Discussion*

The controversy in the present case primarily centers on whether or not the Workers' Compensation Appeals Board erred in adopting the finding that petitioner's injury could not be characterized as "heart trouble" and therefore was not within the statutory presumption of industrial causation encompassed within Labor Code section 3212. Although industry is said to take the employee as it finds him (*Liberty Mut. Ins. Co. v. Ind. Acc. Com.*, 73 Cal.App.2d 555 [166 P.2d 908]), on the basis of finding section 3212 inapplicable and in accordance with section 4663 of the Labor Code,[3] the board was able to apportion against that part of petitioner's disability which would "have resulted, in the absence of the industrial injury, from the 'normal progress' of the pre-existing disease." (*Zemke v. Workmen's Comp. App. Bd.*, 68 Cal.2d 794, 796 [69 Cal.Rptr. 88, 441 P.2d 928]; see also *Ballard v. Workmen's Comp. App. Bd.*, 3 Cal.3d 832, 837 [92 Cal.Rptr. 1, 478 P.2d 937]; *Berry v. Workmen's Comp. App. Bd.*, 68 Cal.2d 786, 789 [69 Cal.Rptr. 68, 441 P.2d 908]; *Reynolds Elec. etc. Co. v. Workmen's Comp. App. Bd.*, 65 Cal.2d 438 [55 Cal.Rptr. 254, 421 P.2d 102]; *Tanenbaum v. Industrial Acc. Com.*, 4 Cal.2d 615 [52 P.2d 215]; *Brown v. Workmen's Comp. Appeals Bd.*, 20 Cal.App.3d 903 [98 Cal.Rptr. 96].)

*Nature of Petitioner's Disability:*

■ In order for petitioner to be entitled to the presumption embodied in section 3212, he must first show that his disability can be characterized as "heart trouble." As stated in *Baker v. Workmen's Comp. Appeals Bd.*, 18 Cal.App.3d 852, 859 [96 Cal.Rptr. 279]: "The presumption is one of occupational causation; it is not a presumption that a disability is attributable to heart trouble."

To resolve this issue, the phrase "heart trouble" must be defined. ■ Although findings of the board on questions of fact are conclusive (Lab. Code, § 5953), "[t]he construction of a statute and its applicability to a given situation are matters of law . . . which [are] reviewable by the courts. . . . [A] decision based on an erroneous interpretation or application of law is ground for annulment of an Appeals Board decision." (1 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed.) § 10.08 [5]. See Lab. Code, §§ 5952-5953.)

---

[3]Labor Code section 4663: "In case of aggravation of any disease existing prior to a compensable injury, compensation shall be allowed only for the proportion of the disability due to the aggravation of such prior disease which is reasonably attributed to the injury."

■ To aid in the construction of section 3212, the court is guided by two principles: The first principle is the legislative mandate that the workers' compensation laws are to be liberally construed in the claimant's favor. (Lab. Code, § 3202; *Garza* v. *Workmen's Comp. App. Bd.,* 3 Cal.3d 312 [90 Cal.Rptr. 355, 475 P.2d 451].) In particular, section 3212 is designed to favor certain public employees—in this case, a county fireman—by "restricting preemployment heart disease as a factor preventing compensation for in-service 'heart trouble.' " (*State Employees' Retirement System* v. *Workmen's Comp. App. Bd.,* 267 Cal.App.2d 611, 617 [73 Cal.Rptr. 172].) The second principle guiding the court is that statutory language is to be construed according to its ordinary and commonly understood meaning. (*Turner* v. *Workmen's Comp. App. Bd.,* 258 Cal.App.2d 442, 448 [65 Cal.Rptr. 825]; see also *County of Los Angeles* v. *Frisbie,* 19 Cal.2d 634 [122 P.2d 526]; *Hom* v. *Clark,* 221 Cal.App.2d 622 [35 Cal.Rptr. 11].)

As a result of the use of the phrase "heart trouble" in Labor Code sections 3212, 3212.2, 3212.3, 3212.5, 3212.7, and Government Code sections 31450-31898, this language has often come under scrutiny. An Attorney General's opinion interpreting this phrase as used in the County Employees Retirement Law of 1937 (Gov. Code, §§ 31450-31898)[4] concluded that "heart trouble" referred to "any injury or disease to that portion of the body which, from an anatomical standpoint, is the heart" (55 Ops.Cal.Atty.Gen. 24, 26). It also noted that "there is nothing in the Government Code section or the Labor Code sections that restrict the term 'heart trouble' to arteriosclerosis or its sequelae." (*Id.,* at p. 25.)

As to those specific afflictions which have been found to be "heart trouble," the more restrictive interpretations have arisen from appeals board decisions which have not been reviewed by appellate courts. Injuries excluded from the meaning of "heart trouble" have included an aneurysm of the arch of the aorta (*Fitzgerald* v. *City of Napa,* 8 Cal.Comp.Cases 90) and a cerebral hemorrhage causing a stroke in an arteriosclerotic hypertensive individual (*Agrella* v. *Industrial Acc. Com.,* 9 Cal.Comp.Cases 240; *Smith* v. *Workmen's Comp. App. Bd.,* 34 Cal.Comp.Cases 198.)

On the other hand, in cases which have for the most part received appellate review, the presumption of these Labor Code sections containing the phrase "heart trouble" has been extended to individuals with

---

[4]Labor Code section 3212 was also enacted in 1937 with an amendment in 1939 to include "heart trouble" within the definition of "injury" under the statute.

acute and chronic arteriosclerotic occlusive disease in the iliac arteries (*Stephens* v. *Workmen's Comp. Appeals Bd.,* 20 Cal.App.3d 461 [97 Cal.Rptr. 713]), atherosclerosis of the coronary artery (*id.*), valvular lesions and scarring due to rheumatic fever (*State Employees' Retirement System* v. *Workmen's Comp. App. Bd.,* 267 Cal.App.2d 611 [73 Cal.Rptr. 172]), arteriosclerotic heart disease or coronary artery disease (*Gillette* v. *Workmen's Comp. Appeals Bd.,* 20 Cal.App.3d 312 [97 Cal.Rptr. 542, 893]; *Bussa* v. *Workmen's Comp. App. Bd.,* 259 Cal.App.2d 261 [66 Cal.Rptr. 204]; *Turner* v. *Workmen's Comp. App. Bd.,* 258 Cal.App.2d 442 [65 Cal.Rptr. 825]), and heart attack diagnosed as heart insufficiency (*Ferris* v. *Industrial Acc. Com.,* 237 Cal.App.2d 427 [46 Cal.Rptr. 913]). As stated by the appellate court in *Knowles* v. *Workmen's Comp. App. Bd.,* 10 Cal.App.3d 1027, 1033 [89 Cal.Rptr. 356]: "There is nothing in section 3212.5 to suggest that an employee must suffer a heart attack to come within its operative purview. That section merely refers to 'heart trouble' and we take judicial notice of the fact that coronary arteriosclerosis amounts to 'heart trouble.' " In accord with this type of thinking, other more generalized afflictions of the heart and even those characterized as "cardiovascular complaints" have also been found to fall within the meaning of "heart trouble." (See *Lamb* v. *Workmen's Comp. Appeals Bd.,* 11 Cal.3d 274 [113 Cal.Rptr. 162, 520 P.2d 978] (claimant initially suffered from hypertension, but died of arrhythmia or ventricular fibrillation); *Horn* v. *Industrial Acc. Com.,* 128 Cal.App.2d 837 [276 P.2d 673] (claimant suffered from coronary artery insufficiency); see also *Thobe* v. *Workmen's Comp. App. Bd.,* 35 Cal.Comp.Cases 114 (essential hypertension was described as a "cardiovascular disability"); *Morgan* v. *Industrial Acc. Com.,* 23 Cal.Comp.Cases 132 (claimant had hypertensive heart disease).)

Furthermore, "heart trouble" has also been found to arise through interaction of the heart with other bodily disorders. In *State Employees' Retirement System* v. *Workmen's Comp. App. Bd.,* 267 Cal.App.2d 611 [73 Cal.Rptr. 172], the statutory presumption of section 3212 was applied in the case of a firefighter who had sustained damage to his heart as a result of rheumatic fever. The section was applied although rheumatic fever was not viewed as being either heart disease, nor as necessarily resulting in cardiac impairment. In *City of Los Angeles* v. *Workmen's Comp. App. Bd.,* 38 Cal.Comp.Cases 561, the claimant was a city fireman who had coronary artery disease, but whose "most disabling problem" was a form of intermittent claudification. Claudification was defined as a lameness resulting from arteriosclerotic disease of the lower extremities. The statutory presumption embodied in section 3212 was applied because the

same body chemistry which caused the claimant's coronary artery disease had also caused the arteriosclerosis responsible for the vascular insufficiency of his legs.

Given these cases and the mandate that section 3212 is to be liberally construed and that statutory language is to be given its commonly understood meaning, the phrase "heart trouble" assumes a rather expansive meaning. This result is further evidenced by the Legislature's decision not to utilize a medical term or to list or require any specific malady for the presumption of section 3212 to become operative, but rather, to employ a lay term which is not necessarily related to physical deterioration or "disease" at all. As defined in Webster's Dictionary, the term "trouble" when used as a noun covers a wide range of meanings, including distress, affliction, anxiety, annoyance, pain, labor, or exertion. The intent of the authors of the amendment adding the phrase "heart trouble" to section 3212 was no doubt to have the meaning of that phrase encompass any affliction to, or additional exertion of, the heart caused directly by that organ or the system to which it belongs, or to it through interaction with other afflicted areas of the body, which, though not envisioned in 1939, might be produced by the stress and strain of the particular jobs covered by the section.[5] (See *Stephens* v. *Workmen's Comp. Appeals Bd., supra,* 20 Cal.App.3d 461, 465-467.)

Utilizing this broad interpretation of the phrase "heart trouble," we find that the board has applied an unduly restrictive definition of that term in adopting the judge's report and in affirming his findings and award. The board did not err in relying on the relevant judgment of a single physician in making its decision, despite that opinion's inconsistency with other medical evidence (*LeVesque* v. *Workmen's Comp. App. Bd.,* 1 Cal.3d 627 [83 Cal.Rptr. 208, 463 P.2d 432]; *Smith* v. *Workmen's Comp. App. Bd.,* 71 Cal.2d 588 [78 Cal.Rptr. 718, 455 P.2d 822]; *Jones* v. *Workmen's Comp. App. Bd.,* 68 Cal.2d 476 [67 Cal.Rptr. 544, 439 P.2d 648]). However, given the broad definition to be accorded "heart trouble" and the entire substance of Dr. Kritzer's report and testimony, this evidence does not constitute substantial evidence to support the board's decision that petitioner did not have "heart trouble."

The board does not seem to be satisfied that petitioner could have "heart trouble" unless his disability could be characterized as a specific

---

[5] We do not say that hypertension, in every instance, constitutes "heart trouble;" nor do we conclude that disorders in other areas of the body that do not place the heart in a "troubled" condition, qualify as "heart trouble."

heart *disease* (i.e., coronary artery disease or coronary arteriosclerotic heart disease). Such a specific condition or disease is not required by, and appears to have been purposefully excluded from, section 3212. Dr. Kritzer never commented in either his report or testimony whether the symptoms and conditions of petitioner might prove "troublesome" to his heart. The single difference between the opinions of Dr. Allen and Dr. Kritzer appears to be merely the name which each has attached to the symptoms which petitioner exhibited. Further, although Dr. Kritzer generally characterized petitioner's disability as "essential hypertension" (high blood pressure occurring without discoverable organic cause), as discussed earlier, in applying the term "heart trouble," it is permissible to determine whether the interaction of this malady with the heart has proven "troublesome" to that organ or has required the heart to engage in disabling exertion or labor.

Initially, it would seem that increased blood pressure, no matter what its organic cause, would trouble the heart as it would require the heart to engage in additional exertion in pumping the blood through the body. However, in petitioner's case, there is even more to link his injury and disability with his heart. In Dr. Kritzer's report of June 14, 1974, he completed his list of petitioner's complaints with the statement: "No *other* cardiovascular complaints." (Italics added.) This final statement would seem to indicate that Dr. Kritzer did find some relationship between the named complaints and the heart and its system. This is confirmed by his recognition of the fast rise of blood pressure in the stress test.

In addition to noting the murmur in petitioner's chest area, Dr. Kritzer's report also included the findings of a widened aorta and of arteriosclerosis of petitioner's iliac arteries. As to petitioner's arteriosclerotic condition, Dr. Kritzer's denial of any relationship between the iliac arteries and the heart was partially undermined by his own definition of an artery. Under that definition, the artery bears a direct relation to the heart and as such any affliction of that area of the body could eventually take its toll on the heart. Furthermore, arteriosclerosis has, for the most part, been previously equated with "heart trouble." (See discussion, *supra.*) On the question of the relationship between petitioner's hypertension and his arteriosclerosis, Dr. Kritzer testified that while coronary artery *disease* would have no effect on hypertension, the aggravation of hypertension would aggravate and increase arteriosclerosis not only "in the coronary vessel but every vessel." Finally, the aorta's being widened would seem to have a direct impact on the functioning of the heart as it is part of that organ's structure.

Perhaps the most convincing evidence that petitioner's disability is "heart trouble" stems from Dr. Kritzer's description of petitioner's ventricular irritability. In his statement, Dr. Kritzer observed that, with exercise, petitioner's blood pressure increases and with that increase "signs of insufficiency [are shown] which [cause] him to skip beats." Obviously, petitioner's hypertension, exhibited with exercise, directly affects and "troubles" his heart as it induces this *insufficiency* resulting in ventricular irritability. It is this condition which prevents petitioner from returning to the physically and emotionally strenuous work of a fireman.

Finally, as to the electrocardiogram results, although Dr. Kritzer found his to be normal, he did concede that the electrocardiogram furnished by Dr. Merliss was "suspiciously abnormal" and that additional testing would be required for him to complete his opinion as to whether or not petitioner had coronary artery disease. Examining the record, there is no evidence of any further electrocardiographic testing; there is only Dr. Weinstein's radiological test indicating the size of petitioner's heart. As stated in *Place* v. *Workmen's Comp. App. Bd.,* 3 Cal.3d 372, 378 [90 Cal.Rptr. 424, 475 P.2d 656]: "Expert medical opinion, however, does not always constitute substantial evidence on which the board may rest its decision. Courts have held that the board may not rely on medical reports . . . based upon inadequate medical history or examinations." An abnormal electrocardiogram is, without doubt, indicative of "heart trouble."[6]

On the basis of this evidence and the legal principles which guide this court, it is beyond question that petitioner's injury is heart trouble within the meaning of Labor Code section 3212. Seizing on Dr. Kritzer's diagnosis that petitioner did not have "heart disease," rather than on the substance of his medical findings, the board erred by concluding that, on that basis, petitioner did not have "heart trouble." This conclusion fails for lack of substantial evidentiary support.

*Apportionment of the Disability:*

■ As petitioner's injury is "heart trouble," the next issue requiring resolution is the extent to which he must be compensated for this disability. To obtain the presumption of section 3212, the "heart trouble" must have developed or manifested itself during a period while

---

[6]Although respondent State Compensation Insurance Fund places great emphasis on the decision in *Baker* v. *Workmen's Comp. Appeals Bd.,* 18 Cal.App.3d 852 [96 Cal.Rptr. 279], from the foregoing evidence it can be seen that petitioner's injury is a physical, as opposed to a psychoneurotic, one.

petitioner, a county fireman, was in such service. Either manifestation or development of the injury during that period will satisfy section 3212 (*State Employees' Retirement System* v. *Workmen's Comp. App. Bd., supra,* 267 Cal.App.2d 611, 617). "Manifestation" is defined as the production of definite symptoms, and "development," as the existence of the injury in an asymptomatic stage (*Stephens* v. *Workmen's Comp. Appeals Bd., supra,* 20 Cal.App.3d 461, 465). In the present case, petitioner both developed and manifested his "heart trouble" during the period of his employment. After passing a pre-employment physical, petitioner commenced his career with the Los Angeles County Fire Department, which lasted from 1940 until 1973. It was not until 1966 that high blood pressure was recorded, and the condition remained asymptomatic, for the most part, until its acute manifestation on May 3, 1973, at which time petitioner was performing his job as a firefighter.

Since petitioner's heart trouble developed and manifested itself during the period of his employment as a county fireman, the presumption of section 3212 that such injury arose out of and in the course of petitioner's employment is available to him. The next question is whether or not it was proper for the board to apportion the disability between industrial and nonindustrial factors. While the code section provides that the presumption is rebuttable, the 1959 amendment of section 3212 prohibits attribution of the injury to "any disease existing prior to such development or manifestation." Both Dr. Allen and Dr. Kritzer agreed that petitioner's employment as a fireman had aggravated his condition, with 50 percent of that injury being attributable to his employment. However, their only means of refuting total industrial causation were their statements that being a fireman could not cause or initiate petitioner's hypertension, and that 50 percent of petitioner's present disability was attributable to the natural progression of his underlying disease. Although dicta of a California Supreme Court decision seemed to negate the prohibition against attribution of the disability to a preexisting disease (*State Comp. Ins. Fund* v. *Industrial Acc. Com. (Quick),* 56 Cal.2d 681 [16 Cal.Rptr. 359, 365 P.2d 415]), this language has been questioned in subsequent appellate court decisions. Instead, those courts have utilized the "plain" language of the 1959 amendment of section 3212 and of its counterpart in Labor Code section 3212.5 (*Bussa* v. *Workmen's Comp. App. Bd., supra,* 259 Cal.App.2d 261; *Turner* v. *Workmen's Comp. App. Bd.,* 258 Cal.App.2d 442 [65 Cal.Rptr. 825]; *Ferris* v. *Industrial Acc. Com.,* 237 Cal.App.2d 427 [46 Cal.Rptr. 913]; see also *Stephens* v. *Workmen's Comp. Appeals Bd., supra; Knowles* v. *Workmen's Comp. App. Bd.,* 10 Cal.App.3d 1027 [89 Cal.Rptr. 356]). As the only evidence to

dispute the presumption of industrial causation was attribution to the normal progress of a disease which antedated petitioner's injury and disability and which had not become disabling until the event for which petitioner was retired (see 2 Hanna, Cal. Law of Employee Injuries and Workmen's Compensation (2d ed.) § 6.03 [3][d]), apportionment in this case was improper. The board erred in not awarding petitioner the full amount accorded by his disability rating without apportionment.

*Extent of Disability:*

Petitioner finally contends that the board's finding that petitioner's disability restricts him to light work in a nonemotionally trying atmosphere is not supported by substantial evidence in the light of the entire record. This contention is without merit. Not only did Dr. Kritzer, who specifically stated that he understood the meaning of these workers' compensation words of art, conclude on the basis of his examination and petitioner's medical history that petitioner would be so limited on the open labor market, but Dr. Allen also similarly assessed petitioner's work restrictions. From petitioner's own testimony as to his recreational and domestic activities, the board could find that his work need not be limited to semi-sedentary work, nor does his level of emotional instability render him totally disabled.

As apportionment is impermissible in the present case, we do not reach the question of the propriety of the board's calculation of the dollar value of petitioner's award under Labor Code section 4658, nor of the timeliness with which petitioner raised this issue.

The order of the board denying reconsideration is annulled and the case is remanded for further proceedings consistent with the views expressed in this opinion.

Loring, J.,* concurred.

A petition for a rehearing was denied October 9, 1975, and the petition of respondent State Compensation Insurance Fund for a hearing by the Supreme Court was denied November 20, 1975.

---

*Assigned by the Chairman of the Judicial Council.