[No. A026405. First Dist., Div. Two. Jan. 17, 1985.]

HAROLD JOHNSON, Petitioner, v.
WORKERS' COMPENSATION APPEALS BOARD and TOWN OF LOS
GATOS, Respondents.

## COUNSEL

Victor H. Beauzay and Beauzay, Hammer, Ezgar, Bledsoe & Sprenkle for Petitioner.

Stuart R. Crymes and Crymes & Hardie for Respondents.

## OPINION

**ROUSE, J.**—An industrially injured employee petitions for review of a decision in which the Workers' Compensation Appeals Board (board) refused to impose a penalty under Labor Code section 5814.[1] We conclude that, as a matter of law, the employer, Town of Los Gatos (Los Gatos), unreasonably delayed payment of benefits, and that the failure of the board to impose the appropriate penalty was error.

### I.

Petitioner, Harold Johnson, worked as a police officer from 1955 until 1970, when he became Los Gatos' police chief. He was employed in that capacity until he became disabled in March 1982.

The facts relevant to our decision are undisputed. During the mid-1960's Johnson began occasionally to experience symptoms in the region of his heart. In the succeeding years the frequency of symptoms increased and Johnson noted a rapid pulse rate, either in association with the symptoms

---

[1] All statutory references will be to the Labor Code.

Section 5814 provides: "When payment of compensation has been unreasonably delayed or refused, either prior to or subsequent to the issuance of an award, the full amount of the order, decision or award shall be increased by 10 percent. The question of delay and the reasonableness of the cause therefor shall be determined by the appeals board in accordance with the facts. Such delay or refusal shall constitute good cause under Section 5803 to rescind, alter or amend the order, decision or award for the purpose of making the increase provided for herein."

or as the manifestation of them. In 1977 he reported the symptoms to his physician, who diagnosed atrial fibrillation. Atrial fibrillation is defined as rapid, irregular twitchings of the muscular wall. (Stedman's Medical Dict. (4th unab. L.Ed. 1976) p. 523, col. 1.) In November 1980, Johnson suffered a myocardial infarction which, physicians agreed, was caused by an embolism (blood clot) which had formed because of the continuing fibrillation problem. In March 1982, while kneeling in his attic at home, Johnson suffered a cerebral "accident" which was caused by another embolism produced by the fibrillation problem. The cerebral embolism seriously affected Johnson's vision and his sense of geographical orientation. He has great difficulty visualizing maps or floor plans. He had to "relearn" his way around home, and easily gets lost in unfamiliar places. The episodes of fibrillation continue.

Johnson was found to be 100 percent disabled, and this finding is not challenged.

Before 1983 it was generally agreed among physicians that Johnson suffered fibrillation for no clearly identifiable reason, and that this fibrillation caused the two embolisms. Doctors Fischer and Blackard, reporting for the respective parties, agreed that the fibrillation problem was caused, in part at least, by occupational stress.

In March 1983, Los Gatos procured a report from Dr. Rosenman. Dr. Rosenman concluded that the other physicians had correctly identified the medical causal mechanism in part, but he believed, additionally, that the atrial fibrillation problem itself had been caused by "slow sinus syndrome." He described the syndrome as a congenital or degenerative condition, unrelated to stress and strain. He concluded, therefore, that Johnson's disability was not industrial.

To that point Los Gatos had voluntarily paid all compensation and medical benefits to which Johnson had a claim. Based upon Dr. Rosenman's report, Los Gatos ceased to pay these benefits. Johnson then requested a 10 percent penalty under section 5814.

The evidence on the section 5814 issue consisted of the sharply conflicting opinions of Doctors Blackard and Rosenman concerning Rosenman's diagnosis of "slow sinus syndrome" as the underlying cause of Johnson's disability. However, as we shall explain, it is unnecessary for us to consider this conflict in the evidence.

The workers' compensation judge imposed the section 5814 penalty. He noted that Los Gatos had apparently accepted liability for some years, and

that the medical reports obtained by the defense before 1983 had consistently indicated that an industrial disability was presented. For Los Gatos then to engage in "physician shopping," procure a new report from a defense-specialist physician located in a different city, and on that basis cease to pay benefits, "amounts to the highest degree of callousness." Therefore, the judge held, Los Gatos would be estopped from contesting the issue of industrial cause and a penalty would be imposed. Los Gatos petitioned for reconsideration and the board rescinded the penalty.

## II.

■ While the board's basis for rejecting the judge's reasoning may have been sound, it appears that the board did not consider the underlying issue of whether payment of compensation had been unreasonably delayed or refused. When that issue is confronted it is clear that Dr. Rosenman's report, even if fully credited, failed to create a sufficient basis for the decision to stop paying benefits.

*Kerley* v. *Workmen's Comp. App. Bd.* (1971) 4 Cal.3d 223 [93 Cal.Rptr. 192, 481 P.2d 200], is the leading case in the interpretation and application of section 5814. ■ There, the court held that "the only satisfactory excuse for delay in payment of disability benefits, whether prior to or subsequent to an award, is genuine doubt from a medical or legal standpoint as to liability for benefits . . . ." (*Kerley* v. *Workmen's Comp. App. Bd., supra,* 4 Cal.3d 223, 230.) ■ "[A]lthough denominated a 'penalty,' the section is to be interpreted liberally . . ." (*id.,* at p. 227), and "the burden is on the employer or his carrier to present substantial evidence on which a finding of such doubt may be based" (*id.,* at p. 230).

Superficially, it would appear that, on the issue of industrial cause, Dr. Rosenman's report would support a genuine doubt from a medical standpoint. However, there are times when, upon analysis, superficially or apparently probative evidence is revealed to be insubstantial.

Here, it is undisputed that, throughout his working life, Johnson was a police officer. ■ For workers' compensation purposes, "[i]n the case of a member of a police department . . . the term 'injury' . . . includes heart trouble . . . which develops or manifests itself during a period while such member . . . is in the service of the police department . . . ." (§ 3212.5.) Furthermore, "Such heart trouble . . . shall be presumed to arise out of and in the course of the employment . . . . [¶] Such heart trouble . . . shall in no case be attributed to any disease existing prior to such development or manifestation." (*Ibid.*)

It appears to be conceded that Johnson suffers "heart trouble." The term "heart trouble" "encompass[es] any affliction to, or additional exertion of, the heart caused directly by that organ or the system to which it belongs, or to it through interaction with other afflicted areas of the body . . . ." (*Muznik* v. *Workers' Comp. Appeals Bd.* (1975) 51 Cal.App.3d 622, 635 [124 Cal.Rptr. 407]; accord *Hamilton* v. *Workers' Comp. Appeals Bd.* (1979) 93 Cal.App.3d 587, 592-593 [155 Cal.Rptr. 721]; *Hart* v. *Workers' Comp. Appeals Bd.* (1978) 82 Cal.App.3d 619, 624 [147 Cal.Rptr. 384]; *Permanente Medical Group* v. *Workers' Comp. Appeals Bd. (Coyne)* (1977) 69 Cal.App.3d 770, 776-778 [138 Cal.Rptr. 373].)

 Similarly, there is no evidence to support the conclusion that the presumption established by section 3212.5 does not come into operation because Johnson's heart trouble developed or manifested itself before 1955, when Johnson began his career as a police officer. Los Gatos impliedly concedes this point as well.[2]

Once operative, the presumption cannot be rebutted by a showing that the heart trouble, in some undetected form, really preexisted the employment.

In *City and County of San Francisco* v. *Workers' Comp. Appeals Bd. (Wiebe)* (1978) 22 Cal.3d 103 [148 Cal.Rptr. 626, 583 P.2d 151] (hereafter *Wiebe*) the California Supreme Court addressed and rejected a constitutional attack upon that provision of section 3212.5 which prohibits attribution of the heart trouble to "any disease existing prior to [the] development or manifestation . . . ." thereof.

The court stated that the presumption was adopted as a response to the "'persisting cleavage in medical theory itself' . . . as to the relationship between stress, physical exertion and progressive heart disease." (*Wiebe, supra,* at pp. 108-109.) Formerly, "the fate of an individual worker's claim generally did not turn on the facts of his particular employment or heart attack, but rather was decided almost fortuitously on the basis of which of the two competing schools of medical thought [i.e., those who accept and those who reject the view that stress or exertion can contribute to the de-

---

[2] "Develop," as used in section 3212.5, means to grow or to evolve, or to become apparent or manifest. (Webster's New Collegiate Dict. (1977) p. 311, col. 2.) "Manifest" in the same sense means to make evident or certain by showing or displaying. (*Id.,* at p. 699, col. 2.) Thus, the presumption begins to operate when the existence of heart trouble, in an officer otherwise within the statute, becomes evident or certain. The statute will not permit the view that the presumption does not operate only because the officer's heart trouble *existed* in some uncertain or nonevident form, undetectable, before he became a police officer.

Here, the evidence is conclusive that Johnson's heart trouble developed or manifested itself no earlier than the mid-1960's and no later than the mid-1970's. During all of that time he was a member of the police department.

velopment of heart trouble] the lay referee or appeals board decided to endorse in the particular case." (*Id.*, at p. 110; italics deleted.) For 20 years the statute did not prevent proof of preexisting disease, and the Legislature found that in such form it "failed to alleviate the gross inequities and unfairness which flowed from the inevitable and inconclusive 'battle of the experts' . . . ." (*Id.*, at p. 111.) The preclusion was adopted as a solution.

■ The court stated the effect of the preclusion clearly. It "does not guarantee [covered] employees that they will recover workers' compensation benefits for a heart attack which occurs during the course of their employment, but leaves the employer free to rebut the statutory presumption by proving that some *contemporaneous* nonwork-related event—for example, a victim's strenuous recreational exertion—was the sole cause of the heart attack." (*Wiebe, supra,* at p. 112; italics added.) That is, an employer may rebut the presumption, but only with proof of causation by a nonindustrial event occurring at the same time as the heart trouble developed or manifested itself.

Los Gatos argues that the Rosenman evidence raised a reasonable doubt as to whether the presumption would be rebutted in this case. It attempts first to distinguish *Wiebe, supra,* as limited to cases involving *coronary heart disease,* which is not present in this case. However, although some of the California Supreme Court's dicta referred to "heart disease" or "heart attack," the statutory phrase "heart trouble" cannot be so limited.[3] The *Wiebe* court impliedly recognized this fact by concluding that employees covered by the presumption are not to be denied workers' compensation when the only basis for finding that the employee's heart *trouble* was nonwork-related rests on evidence that the employee came to his employment with a heart *condition.* (*Wiebe, supra,* at p. 119.)

■ Los Gatos claims that Dr. Rosenman satisfied the *Wiebe* criterion by identifying, as the sole cause of disability, the cerebral embolism, suffered at home in a nonwork-related event. This argument is incorrect both factually and legally. Dr. Rosenman expressed the opinion that Johnson suffers from slow sinus syndrome, which caused episodes of fibrillation, which in turn caused the embolisms, and all of which, together, disabled

---

[3] " 'There is nothing in section 3212.5 to suggest that an employee must suffer a heart attack to come within its operative purview. . . .' " (*Muznik* v. *Workers' Comp. Appeals Bd., supra,* 51 Cal.App.3d 622, 634.) "Given [the] cases and the mandate that section [3212.5] is to be liberally construed and that statutory language is to be given its commonly understood meaning, the phrase 'heart trouble' assumes a rather expansive meaning. This result is further evidenced by the Legislature's decision not to utilize a medical term or to list or require any specific malady for the presumption . . . to become operative, but rather, to employ a lay term which is not necessarily related to physical deterioration or 'disease' at all." (*Id.*, at p. 635.)

him. Moreover, even if the *disability* is viewed as having been caused solely by an embolism in the brain, the *injury* would have to be viewed as "heart trouble" because the embolism formed in the heart and it did so because of a heart defect. It is important to remember that the presumption concerns the injury, not the resulting disability. If by application of section 3212.5 the employee is found to suffer from the injury described as "heart trouble," any death, disability or other effect requiring treatment which results from the injury is compensable. (See §§ 3600, 4600, 4650, 4658.)

Dr. Rosenman reported: "Slow sinus syndrome was obviously present . . . at least by the middle 1960's . . . . Moreover, slow sinus syndrome is due to a defect of the sinoatrial pacemaker of the heart, either from a congenital basis or as a result of degenerative changes occurring locally in the anatomic region of the normal cardiac pacemaker apparatus." A congenital condition is one existing at birth (Stedman's Medical Dict., *supra,* p. 309, col. 2); a degenerative condition is one which worsens over time (*id.,* at pp. 367, 368). Dr. Rosenman testified that by "degenerative," in this case, he meant specifically "a very slow, very gradually developing process of a period of many years." Thus, Dr. Rosenman gave it as to his opinion, in so many words, that Johnson "came to his employment with a heart condition." (*Wiebe, supra,* at p. 119.) Such an opinion is, as a matter of law, insufficient to rebut the statutory presumption.

Los Gatos argues that, since section 5814 leaves it to the board to determine the inherently factual question of the reasonableness of the employer's doubt, we should defer to the board's decision in this case. Surely cases will arise in this setting where the factual issue is debatable, and in such cases we would defer to the board's findings. (See §§ 5952, 5953.) But here the board's only error was that it did not make a finding on the factual issue presented. Moreover, here the evidence is so clear that no factual issue is raised. The question is one of law. (Cf. *Dimmig* v. *Workmen's Comp. Appeals Bd.* (1972) 6 Cal.3d 860, 864-865 [101 Cal.Rptr. 105, 495 P.2d 433].) It resolves in Johnson's favor.[4]

### III.

Under section 5814 employers may not unreasonably delay or refuse compensation, and such action is unreasonable if there is no genuine doubt concerning liability. In a case where the section 3212.5 presumption is known to be operative, and where the medical evidence relied upon to rebut

---

[4]Since the case is resolved in Johnson's favor on this basis, we have no occasion to address his alternate contention that a penalty should have been imposed in condemnation of the practice of "physician shopping."

it is plainly rendered ineffectual by the terms of that statute, the employer's doubt is not a reasonable or genuine doubt.

The opinion and order of January 27, 1984, is annulled. The cause is remanded for reinstatement of the penalty imposed by the workers' compensation judge.

Kline, P. J., and Smith, J., concurred.